**POWELL et al. v. GRAY, Director of Bituminous Coal Division of Department of the Interior, et al. (BITUMINOUS COAL PRODUCERS BOARD FOR DISTRICT NO. 8, Intervenor).**

No. 4671.

Circuit Court of Appeals, Fourth Circuit.

Sept. 26, 1940.

W. R. C. Cocke and Joseph F. Johnston, both of Norfolk, Va. (L. B. Plummer and Wm. H. Delaney, both of Norfolk, Va., on the brief), for petitioners.

Arnold Levy, Asst. Gen. Counsel, Bituminous Coal Division, Department of the Interior, of Washington, D. C. (Abe Fortas, Gen. Counsel, Harold Leventhal, and Robert W. Greenleaf, all of Washington, D. C., Attys., Bituminous Coal Division, Department of the Interior, and Robert L. Stern, Sp. Asst. to the Atty. Gen., on the brief), for respondents H. A. Gray and Harold L. Ickes.

Burr Tracy Ansell, of Washington, D. C., and William A. Grimes, of Baltimore, Md., for intervenor Bituminous Coal Producers Board for District No. 8.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

PARKER, Circuit Judge.

This is a petition to review an order of the Director of the Bituminous Coal Division of the Department of the Interior. Petitioners are receivers of the Seaboard Air Line Railway Company and as such are the holders of coal leases on certain coal lands in Virginia and West Virginia from which they are having coal mined in three separate mines by independent con-

tractors. The coal thus mined is used by petitioners in the operation of the interstate railway system of which they are receivers and before being used is transported in interstate commerce. The receivers, as producers of coal, filed application under Sec. 4-A of the Bituminous Coal Act, 15 U.S.C.A. § 834, asking that they be held exempt from the provisions of Sec. 4 of the Act by reason of the exemption contained in subsection (*l*), pt. 2, 15 U.S.C.A. § 833(*l*) thereof, to the effect that the provisions of Sec. 4 "shall not apply to coal consumed by the producer or to coal transported by the producer to himself for consumption by him." The order of the Director denied this application, and the receivers have filed with this court petition for review under Secs. 4-A and 6(b) of the Act, 15 U.S.C.A. §§ 834, 836(b). Bituminous Coal Producers Board for District No. 8, a district board of code members created under Sec. 4, Part I(a) of the Act, 15 U.S.C.A. § 832(a), has intervened in support of the order of the Director.

There is no question as to the facts of the case, which were fully found by the Director. Briefly stated, they are as follows: Petitioners consume about a million tons of coal annually in their railroad operations. In 1934 they devised a plan for acquiring a portion of this coal at prices less than the minimum prices in effect under the National Industrial Recovery Act, 48 Stat. 195, by acquiring coal leases and securing the services of independent contractors to mine for them coal covered by the leases. This plan was submitted to the NRA authorities and was approved by them as contravening no provision of the law. In 1934 and 1935, petitioners put the plan into effect by leasing the exclusive right to extract coal from mines on three coal tracts upon payment of tonnage royalties, with provision for payment of minimum royalties in any event. In one of the leases, but not in the others, they agreed to pay the property taxes on the coal properties. The leases were on an annual basis, with option on the part of petitioners to renew from year to year, and with the right to terminate them upon termination of contracts with the contractors, who were to mine the coal, for breach or default on the part of these contractors. The leases have been renewed from time to time, two of the renewals, however, being for short periods when it was thought that the price of coal might be affected by the outcome of cases pending in the Supreme Court or the enactment of legislation under consideration by Congress. One of the provisions of the leases was that the owners of the leased mines should lease the mining machinery in the mines to contractors to be designated by petitioners to conduct mining operations for them; and this agreement was duly carried out and the mining machinery leased in accordance with the agreement.

Contemporaneously with the acquirement of the coal leases, petitioners entered into contracts with independent contractors for the mining of the coal subject to the terms of the leases. Under these contracts, a flat sum per ton was to be paid for the mining of the coal, with provision for adjustment to conform to changes in cost of operation due to fluctuation of wages, taxes and certain other costs, and with option on the part of the petitioners to pay on the basis of actual cost plus 10 cents per ton. The contracts provided that the relationship of the contractors to petitioners should be that of independent contractors. Specifically, the contractors agreed to perform at their own expense all the work of mining and loading, including the furnishing of material and supplies and the necessary organization for the work of mining; to assume all obligations of petitioners to lessors, except those relating to royalties, minimum royalties and land taxes, and to indemnify petitioners against any of the liabilities assumed in the leases, with the same exceptions; to pay all taxes on improvements on the land and on all the property except the land; at their own expense to take out and maintain employers liability, casualty and other insurance for the protection of petitioners and themselves; to pay all cost and expense incident to the mining operations and save petitioners harmless from accidents incident thereto; and to assume liability for and save petitioners harmless from loss incident to injury to person or damage to property arising out of mining operations, taxes other than land taxes, fines imposed for violation of law by contractors or their workmen, liens for work or supplies, and attorneys' fees arising in connection with any of these matters. These contracts are terminable by petitioners if they are able to purchase coal on the open market at a price less than the amount paid the contractors plus the amount paid the lessors, and if the contractors fail to reduce their charge to an extent that will either meet or undercut the market prices. In the case

of one of the contracts a similar provision requires the contractor to absorb any increased cost of transportation, in so far as this would result in a cost to petitioners above the market price.

Under these leases and contracts, petitioners have received between 40 and 50 per cent of the coal required for their operations. The contractors receive monthly and weekly instructions from petitioners as to their requirements and as to destination points of coal shipments. The coal is required to meet certain specifications and is inspected at the mines by petitioners' inspectors. The contractors are paid for mining only with respect to coal meeting the specifications, and only such coal is shipped to petitioners. The coal from the West Virginia mines is ordinarily shipped to and consumed in the states of Virginia, North Carolina and South Carolina; that from the Virginia mine, in the states of North Carolina, South Carolina, Georgia and Florida.

In no case does the contractor have or claim any title or interest whatever in the coal in the mines, either before or after severance, and no sale or other transfer of title to any of the coal from the contractors to petitioners takes place at any time. Petitioners are entirely independent of the lessors and the contractors; and these, in turn, are entirely independent of the petitioners and of each other. There is nothing in the evidence to support any other conclusion than that the mines in question are "captive" mines, leased by petitioners and operated through the instrumentality of independent contractors.

The Director denied the exemption prayed by petitioners on the ground that they were not producers engaged in the business of mining coal within the meaning of the Act. This conclusion he based on the fact that the actual work of mining was done by the employees of the contractors and not the employees of petitioners, that the risks imposed by the coal leases or incident to the mining operations were assumed by the contractors and that petitioners had made no investment in coal bearing lands. He found at length the primary facts which we have summarized, and after giving his reasons as above indicated, stated his conclusion as follows:

"In view of these many important factors I am of the opinion that applicants are not a producer of coal within the contemplation and design of the Act. The work of coal mining is performed, paid for, and controlled by the contractors. They are paid a fixed sum per ton for coal of the specified quality which is accepted at the mine by applicants' inspectors. The transaction has the aspects of an ordinary commercial sale and, indeed, it appears that applicants stand in a position not materially different from that of any large consumer who dominates a small source of supply or who has contracted for the total product of a given manufacturing enterprise or tract of land. In every real sense, with respect to the supply of coal obtained from these contractors, applicants have not become a 'producer' but have rather left their 'consumer' position and mobility unchanged."

If as a matter of fact petitioners are nothing more than mere purchasers of coal, as thus found by the Director, they are not subject to the Act at all; for it is producers of coal, and not consumers, who are subject to its provisions. If they are subject to the Act, it is because of their operation of the mines through the instrumentality of the independent contractors; and it would, indeed, be an anomalous situation, if because of this operation petitioners should be held to be producers for the purpose of bringing them within the provisions of the Act and not to be producers within the meaning of the clause exempting producers who consume their own product. Of course, the operator of a captive mine is not to be denied that status because he operates on a royalty basis rather than as owner; and we cannot see that his status is affected because he operates through an independent contractor rather than directly.

■ The primary purpose of the Bituminous Coal Act is to provide for the fixing of maximum and minimum prices for the sale of coal after it has been removed from the ground. It does not attempt to regulate wages, royalties, or any other element of the cost of production. As said by Mr. Justice Douglas in Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 60 S.Ct. 907, 909, 84 L.Ed. 1263, "Its aim is the stabilization of industry primarily through price-fixing and the elimination of unfair competition". The mistake of the Director was due to considering various incidents of the process of production and ignoring the vital element of price regulation. There is manifestly nothing upon which price regulation can

operate where no price is possible; and no price is possible where no sale can possibly take place and all that is involved is the mining of coal under contract for the owner.

█ Of course, in the application of the Act, the substance and not the form of transactions is determinative; and what is in reality a sale may not be camouflaged by calling it something else. Thus, the prices established under the Act could not be evaded by a contract agreeing to pay a certain part of the purchase price of coal as mining costs and the remainder as royalties. Here, however, there is nothing to justify the conclusion that the facts established by the record are not what they purport to be. Petitioners did not agree with the contractors to pay royalties to the owners, nor did they agree with the owners to pay mining costs to the contractors. They controlled the coal in place through leases from the owners; and the contractors were entitled to mine it only because they were mining for petitioners. The petitioners were thus in absolute control of the situation. They did not pay the contractors for the coal, but for mining it. They did not acquire title to the coal from the contractors, but from the owners of the coal lands. So far as the passage of title and the absence of the determinative feature of sale is concerned, we do not see how the case can be distinguished from

that of the captive mine in which coal rights are held under lease and the coal is extracted directly by the lessee. The extraction by an independent contractor working under contract with the lessee does not supply any of the elements of a sale or provide any sort of basis for price regulation.

█ We do not doubt the power of Congress to regulate interstate commerce in coal produced in captive mines; but Congress has not here attempted regulation with respect thereto. On the contrary, coal produced in such mines is excluded from regulation by the express language of Sec. 4, pt. 2(*l*) which provides: "(*l*) The provisions of [sections 831, 832 and] this section shall not apply to coal consumed by the producer or to coal transported by the producer to himself for consumption by him."

Coal from captive mines unquestionably affects the market; but it is not sold or purchased on the market and therefore does not enter into direct competition with coal which is so sold or purchased. The Senate Committee on Interstate Commerce, which had the Act under consideration prior to its passage, directed its attention to this specific matter; and there can be no question but that the Act was adopted with the clear understanding that coal from captive mines was excluded from regulation.[1] Of course, coal from captive mines

[1] On the examination of Charles F. Hosford, Jr., Chairman of the former Coal Commission before the Senate Committee on Interstate Commerce, the following colloquy occurred (Hearings before Committee on Interstate Commerce, U. S. Senate, 2nd Session, 74th Congress, on S. 4668, June 3, 12 and 13, 1936, pp. 32 and 33):

"Senator Minton: One other question. Do you take into consideration captive coal mines in the area in arriving at the weighted average?

"Mr. Hosford: In as much as captive coal does not affect the commercial market, it has been disregarded, sir.

"Senator Minton: And in this bill it is only considered for the purpose of the tax?

"Mr. Hosford: Yes, sir.

"Senator Davis: What percentage of the coal produced now is consumed by railroads?

"Mr. Hosford: Approximately 25 per cent.

"The Chairman: So that the operator that has a captive mine would have an

advantage over his competitors, would he not, because he would get his coal for as low a price as he wants to?

"Mr. Hosford: He always could do that, Senator.

"The Chairman: I say, he still can. The effect of it would be to raise the price, though, to the man who has not got a captive mine, would it not?

"Mr. Hosford: You mean, the effect of this bill?

"The Chairman: Yes, what you want to do is to raise the price of coal?

"Mr. Hosford: Let us analyze it, Senator.

"The Chairman: Before you do that, let me ask you this: I suppose if this bill is going to be effective it is going to have a tendency to raise prices of coal where these people are cutting prices?

"Mr. Hosford: That is correct.

"The Chairman: Consequently the man who has a capitive mine can still get his coal more cheaply, but the man who has to buy it will not be able to get his coal cheaper, because you raise the price of the coal to him; is not that correct?

is subject to the tax imposed by Sec. 3(a) of the Act, 15 U.S.C.A. § 830(a); but that has been paid and no question with regard thereto is here involved.

█ We have no doubt but that petitioners are "producers" of coal within the meaning of Sec. 4 pt. 2(*l*) above quoted, as well as other provisions of the Act. Respondent's point to Sec. 17(c) of the Act, 15 U.S.C.A. § 847(c), which provides that "The term 'producer' includes all individuals, firms, associations, corporations, trustees, and receivers engaged in the business of mining coal". They argue that only the person, corporation, etc., that does the actual mining comes within the definition. We think that one who has the coal mined through the instrumentality of an independent contractor falls just as clearly within the definition. Qui facit per alium, facit per se. Certainly if these petitioners were selling the coal mined for them by the independent contractors, we would not hesitate to hold that they were subject to the code and price-fixing provisions of the Act; and on the same principle we must hold that, where they consume the coal thus produced, they are exempt from those provisions under Sec. 4, pt. 2(*l*). For the purpose of the Act, we cannot see what difference it makes whether the owner of a mine digs the coal himself with his own organization or whether he has it dug for him by an independent contractor, who assumes the risks and responsibilities of that relationship. In either event, the owner causes the coal to be mined and prepared for use. He is the one by whom the first sale after production is made, if it is made. If he sells it, he should certainly be held subject to the regulatory provisions of the Act; and if he consumes instead of selling it, there is as much reason for exempting him from the regulatory provisions in the one case as in the other. To say, as does the Director, that petitioners do not pay the cost of mining the coal, is not correct. They pay the cost on a tonnage basis to the contractors. As well say that the builder of a house does not pay the cost of installing the plumbing because he contracts with an independent contractor to install it.

The Director says that "the basic purpose of this Act is to enable 'producers' to whom it applies to realize their weighted average cost of production". This, however, the Act attempts to accomplish by authorizing that maximum and minimum sales prices be fixed for producers; and this, we think, clearly indicates that the producers contemplated are those who either through themselves or through others prepare the coal for market and are in position to, sell it. An independent contractor who merely mines coal for another cannot occupy this position because he has no power to sell. The owner or lessee of the coal who has had it mined by the independent contractor does occupy such position.

A case very much in point is Consolidated Indiana Coal Co. v. National Bituminous Coal Commission, 7 Cir., 103 F. 2d 124, 129. In that case the coal was mined by the subsidiary of a railway company which owned the coal through another subsidiary. The railway consumed the coal produced. It was held that the coal was exempt from the provisions of the Act under Sec. 4, pt. 2(*l*) whether the producing corporation was regarded as a separate entity from the railroad corporation or not. The court said:

"In the instant situation, the trustees of the Railway Company could produce coal only by agents, and we discern nothing to preclude a corporation from being the agency thus utilized. We, therefore, are of the opinion that the coal involved in this proceeding was produced by the trustees by and through the agency of petitioner, and that it is consumed by the trustees in the operation of its railroad. Being both the producer and the consumer of the coal, it

"Senator Minton: The man who has a captive mine is not competing at all.

"The Chairman: Yes, he is, he is competing in the industry.

"Mr. Hosford: As I understand the language of this bill, the price provisions do not apply to captive coal at all.

"Senator Davis: What percentage of the coal produced is captive coal?

"Mr. Hosford: I would say approximately 10 per cent; slightly over that, Senator Davis.

"Senator Neely: How much of that is consumed by the general public, what proportion of it and what proportion by the owners of the captive mines? In other words, to what extent does that captive coal compete with the other part of the mining industry?

"Mr. Hosford: It does not compete directly, sir.

"Senator Neely: That is what I thought."

is entitled to the exemption provided in Section 4-II (*l*) of the Act.

\* \* \* \* \* \*

"That Congress intended to exclude from the requirements of Section 4, coal consumed by the producer, is obvious, and we think it must be held that such exclusion is permissible whether the consumer produced the coal in its individual capacity or through the capacity of an agent. To hold otherwise is to countenance a situation in the instant matter which borders close to absurdity."

For the reasons stated, we are of opinion that the decision of the Director is not supported by substantial evidence and is based upon error of law. The order of the Director denying exemption to petitioners will accordingly be reversed and set aside, and the cause will be remanded to the Director for further proceedings not inconsistent herewith.

Reversed.