**KEYSTONE MINING CO. v. GRAY (BI-TUMINOUS COAL PRODUCERS BOARD FOR DIST. NO. 1, Intervener).**

No. 7497.

Circuit Court of Appeals, Third Circuit.

April 22, 1941.

**2**

J. H. Oliver and Franklin B. Gelder, both of Scranton, Pa. (Douglas Swift, of New York City, on the brief), for petitioner.

Frank G. Smith, of Clearfield, Pa., for intervenor.

David L. Kreeger, and Abe Fortas, Gen. Counsel, Harold Leventhal, and Evelyn Neilson Cooper, all of Washington, D. C. (Robert L. Stern, Sp. Asst. to Atty. Gen., on the brief), for respondent.

Before BIGGS, MARIS, and GOOD-RICH, Circuit Judges.

BIGGS, Circuit Judge.

### The Facts.

The petitioner, Keystone Mining Company, is a corporation of the State of Pennsylvania, wholly owned and controlled by the Delaware, Lackawanna and Western Railroad Company. It has no funded indebtedness. It owns coal-mining properties in Pennsylvania and produces coal from its mines at cost for use in the locomotives of the Lackawanna Railroad Company. The petitioner has a board consisting of five directors who are elected by the vote of the stock held by the Lackawanna Railroad Company. Two of these directors are officials of the Lackawanna Railroad Company, being respectively general attorney and general superintendent. Keystone's treasurer is also the secretary-treasurer of the Lackawanna Railroad Company; its auditor is assistant to the Lackawanna Railroad Company's comptroller. The petitioner has an office at Scranton, Pennsylvania, which is furnished to it gratis by the Lackawanna Railroad Company. The coal company's books are maintained at Lackawanna Railroad Company's office at New York City.

The petitioner has absolute ownership of the coal properties, the mining equipment and accessories. It leases some parts of the properties to third persons. The title to the coal mined is retained by Keystone until it is loaded for shipment in cars at the tipples upon its property. The petitioner has a mining supply store which is managed by it. The Lackawanna Railroad Company does not supervise Keystone's operations. These operations are conducted by petitioner's general superintendent subject to the supervision of its president. These two officers are neither directors, officers, nor employees of the Lackawanna Railroad Company. Keystone's legal work is handled by its secretary who is not employed by the Lackawanna Railroad Company.

The petitioner employs about nine hundred men. Its superintendent hires and discharges them. He purchases all mining supplies and necessary equipment and bills them to petitioner. The coal company maintains its own bank account and pays its employees by checks drawn against this account. Its employees who are also employees of the Lackawanna Railroad Company receive salary checks from the petitioner which cover their services to it in so far as their services can be allocated to it. Charges capable of being allocated directly to Keystone are paid by it. Petitioner enters into collective bargaining contracts with a local of the United Mine Workers of America at Scranton and is also a member of an operators association. It assumes liability for all accidents which may happen to its employees, settles claims against it, using its own checks and vouchers for this purpose, and, being a self-insurer under the Pennsylvania Workmen's Compensation Insurance Law, has deposited United States government bonds under a trust agreement in accordance with law.[1]

Keystone pays its own federal, state and local taxes, files in its own name all the returns and reports required of it, including the reports required by the National Bituminous Coal Commission.[2] Prior to 1934, however, the petitioner's federal income tax returns, consolidated with those of the Lackawanna Railroad Company, were filed by the latter company. Until April, 1938, Keystone paid all assessments

---

[1] 77 P.S. § 501.

[2] 53 Stat. 813, 1431, 5 U.S.C.A. § 133s footnote.

levied against it as a member of the Bituminous Coal Code.

As we have indicated, all of the coal produced by the petitioner (save that sold to its own employees) is sent to the Lackawanna Railroad Company. There is no written contract between the coal company and the railroad company for the mining and sale of coal, but the railroad company places orders as coal is required by it through its general purchasing agent. The quantity of coal produced by the petitioner is insufficient to meet the railroad company's demands and that company procures coal also from other sources. When coal is needed, the railroad company's purchasing agent notifies Keystone's superintendent of its requirements and gives him loading instructions and shipping directions. When the required tonnage is produced it is placed in railroad cars and is shipped in interstate commerce over lines of the Pennsylvania Railroad Company to designated points upon the Lackawanna Railroad Company's trackage. Petitioner's officers prepare and render monthly accounts or invoices to the purchasing agent of the Lackawanna Railroad Company. The coal furnished by Keystone is priced so as to approximate the cost of production, including all of the expenses incurred by the petitioner, less the income received by it from its mine store, its rented cottages, its oil and gasoline leases and the government bonds owned by it, the price of the coal being raised or lowered from time to time as is necessary to cover the expenses of petitioner and to prevent its operations from creating a deficit in its treasury. The Lackawanna Railroad Company for its part makes advances to the petitioner, usually upon a semi-monthly basis, as requested by the coal company in order to enable it to meet its payroll and other current expenses. The railroad company also advances sums of money to meet the petitioner's purchases of supplies and materials. It should be noted that the total of all advances equals approximately the total price of the coal received by the railroad from petitioner, but apparently no precise balance is ever struck. The accounting systems of Keystone and the railroad company are kept entirely separate and distinct, the railroad including as part of its operating expenses the price at which it takes coal from the petitioner plus the freight charges for transportation from petitioner's mines to points on Lackawanna's lines. The coal company also prepares statements and balance sheets showing profit and loss and assets and liabilities. It should be pointed out, none the less, that sums going to make up profit or loss which enter into the determination of cost of production of the coal appear only upon petitioner's books and are not directly reflected in the Lackawanna Railroad Company's books. Keystone keeps the ordinary books of account which are kept by most private corporations.

Further facts must be stated in order that a fair picture may be presented of the relations of the two companies. Prior to 1934, when consolidated income tax returns were filed by the Lackawanna Railroad Company for itself and Keystone, the coal company delivered all of its coal to the railroad company at approximately the market price. Following the abolition of the consolidated income tax privilege that practice was abandoned. Prior to 1934, Keystone also declared dividends. These, however, never were actually paid to the Lackawanna Railroad Company, but were reflected in bookkeeping items by the two companies; that is to say, the coal company received credits upon the books of the railroad company to the extent of the dividends declared by Keystone. The general policies of the petitioner are established by consultation between its president and the president of the Lackawanna Railroad Company.

### The Law.

The petitioner prayed the National Bituminous Coal Commission to enter an order exempting it from the provisions of Section 4, 15 U.S.C.A. §§ 831–833, and Section 4-A, 15 U.S.C.A. § 834, of the Bituminous Coal Act of 1937, c. 127, 50 Stat. 72, 15 U.S.C.A. §§ 828–851, by virtue of Section 4, pt. II($l$) of the Act, 15 U.S.C.A. § 833($l$) with respect to the coal produced and disposed of by it. The Director of the Bituminous Coal Division[3] denied exemption and a petition was filed in this court to review the Director's order. This court

---

[3] The National Bituminous Coal Commission was abolished and its functions were transferred to the Secretary of the Interior pursuant to Section 4(b) of Re- organization Plan No. II which became effective July 1, 1939. 53 Stat. 813, 1431, 5 U.S.C.A. § 133s footnote.

has jurisdiction of the proceeding by virtue of Sections 4-A, 15 U.S.C.A. § 834, and 6(b), 15 U.S.C.A. § 836(b), of the National Bituminous Coal Act.

Section 4, pt. II(*l*) of the Act, 15 U.S.C.A. § 833(*l*) provides: "The provisions of [sections 831, 832 and] this section shall not apply to coal consumed by the producer or to coal transported by the producer to himself for consumption by him." The contention of the petitioner was and is that it is a wholly owned agency of the Lackawanna Railroad Company, that it has but one function, viz., the production of coal for the Lackawanna Railroad Company's use at cost, and that since such is its status it is entitled to the exemption provided in the section quoted.

### The Purposes of the National Bituminous Coal Act.

Section 1 of the Act, 15 U.S.C.A. § 828, states that the regulation of the sale and distribution in interstate commerce of bituminous coal is imperative for the protection of such commerce and that there exist practices and methods of distribution and marketing of coal that waste natural resources and disorganize, burden and obstruct interstate commerce, with the result that the regulation of prices and of unfair methods of competition is necessary to promote interstate commerce in bituminous coal and to remove burdens and obstructions from it. Section 2, 15 U.S.C.A. § 829, sets up the National Bituminous Coal Commission and specifies its duties, which include the power to make and promulgate reasonable rules and regulations for carrying out the provisions of the act and to initiate and conduct research designed to improve standards and methods in the mining, conservation and utilization of coal. Section 3(a), 15 U.S.C.A. § 830(a), imposes an excise tax of 1% per ton of two thousand pounds " * * * upon the sale or other disposal of bituminous coal * * * when sold or otherwise disposed of by the producer thereof * *". The term "disposal" as used in this section is defined as including "consumption or use * * * by a producer". Section 3(b), 15 U.S.C.A. § 830(b), imposes an excise tax in an amount equal to 19½% of the sale price at the mine, and, in the case of coal disposed of otherwise than by sale at the mine and coal sold otherwise than through an arms' length transaction, an excise tax of 19½% of the fair market value of such coal at the time of its dis-

posal or sale. Subsection (b) also states that if any producer is a code member as provided in Section 4 of the act, 15 U.S.C.A. §§ 831–833, the sale or disposal of coal by such a producer shall be exempt from the 19½% excise tax. Section 3(d), 15 U.S.C.A. § 830(d), provides that when coal is disposed of otherwise than by sale at the mine or sold otherwise than through an arms' length transaction the Commissioner of Internal Revenue shall determine the market value of the coal in order to provide a base for the tax imposed by Section 3(b), 15 U.S.C.A. § 830(b).

Section 4, 15 U.S.C.A. §§ 831–833, sets up the Bituminous Coal Code and Section 4, pt. I(a), 15 U.S.C.A. § 832(a), provides for the organization of twenty-three district boards of code members and prescribes their duties which include the establishment of minimum prices, the setting of territorial boundaries or limits, of minimum price areas, and other important functions. Section 4, 15 U.S.C.A. §§ 831–833, also provides that producers accepting membership in the code as provided in Section 5(a), 15 U.S.C.A. § 835(a), shall be code members and the code provisions shall apply only to such code members. Section 5(a), 15 U.S.C.A. § 835(a), provides for the acceptance of membership in the code, and Section 5(b), 15 U.S.C.A. § 835(b), states that membership in the code shall exempt the coal producer from the 19½% excise tax prescribed by Section 3(b), 15 U.S.C.A. § 830(b). Section 4, pt. I(b), 15 U.S.C.A. § 832(b), provides that the expenses of administering the code by the respective district boards shall be borne by the code members in the respective districts, each sharing its proportionate expenses "as assessed, computed on a tonnage basis" in accordance with the regulations prescribed by the boards with the approval of the Commission.

Section 4, pt. II of the Act, 15 U.S.C.A. § 833, also deals with marketing and provides for proposed minimum prices so set as to yield a return per net ton for each district in a minimum price area with a "minimum-price-area table" equal to a weighted average of total cost. There follows the minimum-price-area table placing areas of the United States (and Alaska) in districts, providing also that the proposed minimum prices shall be just and equitable as between producers within the district and that no minimum price shall be pro-

5

posed that permits dumping. Section 4, pt. II(b), 15 U.S.C.A. § 833(b), provides that the district boards shall "under rules and regulations established by the Commission, coordinate in common consuming market areas upon a fair competitive basis the minimum prices and the rules and regulations proposed by them, * * *".

Going on with marketing provisions, the act states that the Commission may establish maximum prices for coal in any district when in the public interest the Commission deems it necessary, for review by way of petition to the Commission if a code member is dissatisfied with coordination of prices or upon failure to establish coordination of prices. Subsection 4, pt. II (e), 15 U.S.C.A. § 833(e), provides that no coal subject to the provisions of the section shall be sold or delivered or offered for sale at a price below the minimum or above the maximum established by the Commission and that any such sale or delivery or offer for sale is a violation of the code. Section 4, pt. II (i), 15 U.S.C.A. § 833 (i), deals specifically with unfair methods of competition. Section 4, pt. II (l), as we have already indicated, is the exemption clause. Section 4-A, 15 U.S.C. A. § 834, provides among other things, that the filing of an application setting forth a claim for exemption in good faith shall exempt the applicant until such time as the Commission shall pass upon the application.

Section 5, 15 U.S.C.A. § 835, deals with the organization of the code. Section 6, 15 U.S.C.A. § 836, provides for review by the Commission and review of the Commission's orders by the Circuit Courts of Appeals and provides penalties. Section 6(c), 15 U.S.C.A. § 836(c), provides that the findings of the Commission as to facts if supported as to substantial evidence shall be conclusive. Section 7, 15 U.S.C.A. § 837, deals with the application of internal revenue laws and Section 8, 15 U.S.C.A. § 838, has to do with investigations by the Commissioner. Section 9, 15 U.S.C.A. § 839, deals with labor relations and collective bargaining, and Section 10, 15 U.S. C.A. § 840, deals generally with the required reports of producers, penalties imposed upon officers or employees of the Commission, and penalties imposed upon the producer if he fails to file the required reports. Section 17, 15 U.S.C.A. § 847, defines the terms used in the act.

Section 17(c) states that "The term 'producer' includes all individuals, firms, associations, corporations, trustees, and receivers engaged in the business of mining coal." Section 17(d), 15 U.S.C.A. § 847(d), states that "The term 'interstate commerce' means commerce among the several States and Territories, with foreign nations, and with the District of Columbia."

The act presents a comprehensive and detailed plan for the management of the bituminous coal market in order to avoid obstructing interstate commerce in coal by too low and too competitive prices. As was stated by Mr. Justice Douglas, in Sunshine Coal Company v. Adkins, 310 U. S. 381, 388, 391-393, 60 S.Ct. 907, 84 L.Ed. 1263, its aim is the stabilization of the industry primarily through price fixing and the elimination of unfair competition and a producer of bituminous coal in interstate commerce who is not a member of the code becomes subject to the excise tax of Section 3(b). Thus is supplied the incentive to code membership and it is obvious that most if not all bituminous coal producers must be members of the code and bound by its provisions if the industry is to be stabilized by price fixing and the elimination of unfair competition in the manner contemplated by Congress.

The Effect of Exemption if Allowed in the Case at Bar.

What is the effect of the exemption clause of Section 4, pt. 11, (l), 15 U.S.C.A. § 833 (l)? If, as the petitioner contends, this clause serves to relieve it of the provisions of Sections 4, 15 U.S.C.A. §§ 831-833, and 4-A, 15 U.S.C.A. § 834, of the Act, it is obvious that it need not remain a code member and would not be bound by any of the regulatory provisions relating to marketing, minimum price areas, unfair methods of competition or discrimination, referred to in those sections. If, on the other hand, the coal produced by the petitioner is not "subject to the application of the conditions and provisions of the code provided for in Section 4 [sections 831-833], or of the provisions of Section 4-A [834]", as provided in Section 3(b), 15 U.S.C.A. § 830(b), the coal produced by the petitioner would be subject neither to regulation nor to the 19½% excise tax. The Supreme Court in the Sunshine Coal Company case, 310 U.S. page 392, 60 S.Ct. page 912, 84 L.Ed. 1263, stated

that the tax "* * * was intended to apply only to those *sales* by non-code members which 'would be' subject to *regulation* under section 4." In other words, all the coal produced by the petitioner (save that small quantity which goes to its employees) would be subject to regulation under Section 4, 15 U.S.C.A. §§ 831–833, since all of it with the exception indicated goes into interstate commerce, if the exemption provisions of subsection (*l*) cannot be applied for its benefit. By availing itself of the exemption of subsection (*l*), the petitioner avoids both the 19½% tax and the regulatory provisions of Section 4, 15 U.S.C.A. §§ 831–833, and 4-A, 15 U.S.C.A. § 834. The Lackawanna Railroad Company, which is now able (quite properly) to obtain a large portion of its coal at a low cost, would be able to obtain that coal at a still lower cost because its subsidiary, the petitioner, would be relieved of the necessity of code cost and obligations of code membership and the excise tax of 19½% could not be imposed upon the producer, the Lackawanna Railroad Company at the same time remaining relieved of any obligation or liability for management of the properties.

It is obvious that a literal interpretation of Section 4, pt. II(*l*), 15 U.S.C.A. § 833(*l*), will not allow the petitioner to be relieved of the burden of Sections 4, 15 U.S.C.A. §§ 831–833, and 4-A, 15 U.S.C.A. § 834, for the coal produced by the petitioner is not consumed by it or transported by it to itself. Quite the opposite is in fact the case, for substantially all the coal produced by the petitioner is produced for the benefit of the Lackawanna Railroad Company, is transported to that company and is disposed of to it. Moreover, Section 17(c), 15 U.S.C.A. § 847(c), as we have already stated, defines the term "producer" as including corporations "engaged in the business of mining coal" and the petitioner is certainly a producer within the precise definition of the statute. It is at this juncture that the petitioner invokes the agency rule in an attempt to arrive at the same result which would be achieved by true ownership and management of its properties by the Lackawanna Railroad Company.

## The Agency Rule.

The agency rule is an instrumentality for piercing the veil of the corporate entity, a fiction oddly [4] employed to look through a fiction. The petitioner has cited on its brief a number of typical cases in which the agency rule has been applied. For example in Chicago, Milwaukee & St. Paul Railway Company v. Minneapolis Civic & Commerce Association, 247 U.S. 490, 500, 501, 38 S.Ct. 553, 62 L.Ed. 1229, the Supreme Court held that the Minneapolis Eastern Railway Company could not impose carrying charges distinct from those of its parent corporation simply because it was a separate legal entity. See also the opinion of Mr. Justice Holmes in Gulf Oil Corporation v. Lewellyn, 248 U.S. 71, 72, 39 S.Ct. 35, 63 L.Ed. 133.

In Hart Steel Company v. Railroad Supply Company, 244 U.S. 294, 298, 37 S.Ct. 506, 61 L.Ed. 1148, it was held that the agency rule might be asserted in a patent case to prevent the retrial of an issue previously adjudicated. In Southern Pacific Company v. Lowe, Jr., Collector, 247 U.S. 330, 337, 38 S.Ct. 540, 62 L.Ed. 1142, the rule was invoked to the end that dividends "constructively" received by way of bookkeeping items by a parent corporation from a wholly owned subsidiary should not be taxable to the parent. In Davis v. Alexander, 269 U.S. 114, 115, 46 S.Ct. 34, 70 L.Ed. 186, the Supreme Court disregarded the fiction of the corporate entity, holding that where one railroad company actually controls another and operates both lines as a single system, the dominant company would be held liable for injuries due to the negligence of the subsidiary company.

Further citation of authorities upon the nature of the agency rule or explanation of circumstances under which the fiction of the corporate entity will be disregarded would be fruitless. A comprehensive summary of decisions upon this subject is contained in Majestic Co. v. Orpheum Circuit, 8 Cir., 21 F.2d 720, 724–725. We think we may say that the fiction of the corporate entity will be disregarded where it is used as an instrumentality to defeat the public convenience or to per-

---

[4] The word "oddly" is our tribute to the intricacy of the judicial mind. The captious person might inquire whether the piercing of the corporate veil was a fiction or whether the corporate veil, itself, was a fictitious veil. We think, however, that the coal producer is bent on rending its fictitious veil with a fictitious instrumentality.

petrate fraud. [5] As the converse to the ruling enunciated by the Supreme Court in Chicago, Milwaukee & St. Paul Ry. Co. v. Minneapolis Civic & Commerce Association, supra, we conclude that the agency rule should not be applied and that corporate entity should not be disregarded in order to avoid the effect of a regulatory statute enacted in the public interest. We think that where a remedial statute is involved the purpose of the legislation must be kept in view and that the agency rule should not be applied in derogation of the plain intention of the legislature. However, the application or non-application of the agency rule has been involved in three cases arising under the National Bituminous Coal Act. We will proceed to consider these cases.

In the first of them, Consolidated Indiana Coal Company v. National Bituminous Coal Commission, 7 Cir., 103 F.2d 124, 129, the petitioner's application for exemption, based as here upon Section 4, pt. II($l$), 15 U.S.C.A. § 833($l$), was denied by the National Bituminous Coal Commission and a petition to review that order was filed with the Circuit Court of Appeals for the Seventh Circuit. It appeared that all of the petitioner's capital stock, with the exception of qualifying shares, had been issued to Chicago, Rock Island and Pacific Railway Company, for which trustees had been appointed pursuant to the provisions of Section 77 of the National Bankruptcy Act, 11 U.S.C.A. § 205. The petitioner sold one of its mines to the Rock Island Improvement Company, a wholly owned subsidiary of the railroad company, in return for bonds which were turned over by it to the railroad company. Rock Island Improvement Company then leased the mine back to the petitioner. The petitioner proceeded to operate the property, paying the Improvement Company the sum of three cents per ton for all coal produced by way of rental and for depletion. With the exception of the superintendent of the mine, the petitioner's officers were appointed by the trustees from their official staff and received no pay from the petitioner. All of the petitioner's officers were full time employees of the trustees. The trustees notified the superintendent of the mine from time to time as to how much coal the railroad company desired and with certain unimportant exceptions the trustees took all of the coal produced by the petitioner, the coal being consigned to various points on the railroad company's system. The petitioner sent invoices to the trustees twice a month which covered the cost of production, including wages and salaries, compensation and other insurance and a royalty paid to the Improvement Company. The trustees in turn issued vouchers to the petitioner without allowance for profit to the petitioner, which were deposited to the petitioner's account and from which it paid its expenses. The petitioner's contracts for the hiring of men and the purchase of supplies were subject to supervision by the chief operating officials of the trustees.

Upon review of the case the court held that petitioner was the trustees' agent for the production of coal and was therefore entitled to be exempted from the operation of the act by virtue of the provisions of subsection ($l$). It should be pointed out, however, for whatever the distinction is worth, that in the cited case the petitioner did not have title to the coal rights or to any property, personal or real, used for the production of the coal. None the less the decision is in fact based on the application of the agency rule, the court stating, "There are numerous cases wherein the courts have recognized that a corporation, in its relation with another, may be merely that of agent, and we see no reason why it should be otherwise. In the instant situation, the trustees of the Railway Company could produce coal only by agents, and we discern nothing to preclude a corporation from being the agency thus utilized. We, therefore, are of the opinion that the coal involved in this proceeding was produced by the trustees by and through the agency of petitioner, and that it is consumed by the trustees in the operation of its railroad. Being both the producer and the consumer of the coal, it is entitled to the exemption provided in Section 4, [pt.] II($l$) of the Act."

---

5 In Berkey v. Third Ave. R. Co., 244 N.Y. 84, 155 N.E. 58, 61, 50 A.L.R. 599, Judge Cardozo said: "The logical consistency of a juridical conception [agency] will indeed be sacrificed at times, when the sacrifice is essential to the end that some accepted public policy may be defended or upheld. This is so, for illustration, though agency in any proper sense is lacking, where the attempted separation between parent and subsidiary will work a fraud upon the law."

The court referred to the legislative history of the act, making specific reference to the fact that the bill was amended in the Senate so as to define "producer" to include "a wholly owned subsidiary or other legal entity having identical ownership", and that this amendment was eliminated in conference between the Houses and did not become a part of the law. The court disposed of the argument made by the Commission that because the amendment proposed was rejected by Congress, it was the intention of Congress not to permit the exemption of coal produced by a wholly owned subsidiary by stating that an intention to abrogate the law of principal and agent could not be so imputed to Congress.

In the case of Northwestern Improvement Co. v. Ickes, 111 F.2d 221, the Circuit Court of Appeals of the Eighth Circuit reached the contrary result though upon a somewhat different state of facts. The petitioner, a wholly owned subsidiary of the Northern Pacific Railway Company, was engaged in operating coal mines, the coal from which was sold to the railway company. The petitioner's officers and directors were officers of the railroad company. The court found that the transactions between the petitioner and the railway company were at arms' length, however, because the railroad company had called for bids as prescribed by Section 10 of the Clayton Act, 38 Stat. 734, 15 U.S.C.A. § 20. The prime question presented to the court for its determination was whether the transactions between the petitioner and the railway company were interstate or intrastate transactions. Since it appeared that intrastate and interstate transactions had been inextricably mingled, the court held that all transactions between the petitioner and the railway company must be deemed to be within the purview of the act, and thereupon affirmed the Commission's order denying the petitioner's application for exemption.

In Powell v. Gray, 114 F.2d 752, [6] the Circuit Court of Appeals for the Fourth Circuit overruled a decision of the Director of the Bituminous Coal Division of the Department of the Interior refusing to grant the operating trustees of Seaboard Airline Railway Company the exemption from the provisions of Section 4 of the act, 15 U.S.C.A. §§ 831–833, by virtue of the provisions of subsection (*l*) thereof. We shall deal with the facts in some detail since they are closely analogous to those of the case at bar. The petitioners had devised a plan for obtaining part of the coal consumed by the Seaboard Railway Company at less than the minimum prices in effect under the National Industrial Recovery Act, 48 Stat. 195, by acquiring coal leases and securing the services of independent contractors to mine the coal for them. A flat sum per ton of coal mined was paid to these contractors with a provision for adjustment of that sum in case of changes in cost of mining operations. The contractors agreed at their own expense to do the work of mining and loading, to furnish materials, supplies and the necessary organization, to assume all obligations of the petitioners to the lessors save royalty payments, to pay all taxes with certain exceptions, to maintain at their own expenses employers liability, casualty and other insurance, to pay all the costs and expenses incident to the mining operations and save the petitioners harmless from any loss, damage, taxes (other than land taxes), fines imposed for violations of laws, liens for work or supplies, and attorneys' fees. In short, the leases were to be taken over and operated by the contractors, but under no circumstances could the contractors have any title in the coal or in the mines, either before or after severance. The fact last stated supplies the sole large distinction between the facts of the cited case and those of the case at bar.

The court, by Judge Parker, stated, 114 F.2d page 754, "There is nothing in the evidence to support any other conclusion than that the mines in question are 'captive' mines, leased by petitioners and operated through the instrumentality of independent contractors." The Director had denied the exemption on the ground that the petitioners were not producers engaged in mining coal within the meaning of the act. In this connection the court said, 114 F.2d page 754, "If they [the petitioners] are subject to the Act, it is because of their

---

[6] On March 31, 1941, the judgment of the Circuit Court of Appeals for the Fourth Circuit in this case was affirmed by the Supreme Court by an equally divided court, 61 S.Ct. 824, 85 L.Ed. ——.

This action by that court is not authority on the principle of law to be applied in the case before us. Hertz v. Woodman, 218 U.S 205, 30 S.Ct. 621, 54 L.Ed. 1001.

operation of the mines through the instrumentality of the independent contractors; and it would, indeed, be an anomalous situation, if because of this operation petitioners should be held to be producers for the purpose of bringing them within the provisions of the Act and not to be producers within the meaning of the clause exempting producers who consume their own product. Of course, the operator of a captive mine is not to be denied that status because he operates on a royalty basis rather than as owner; and we cannot see that his status is affected because he operates through an independent contractor rather than directly."

The court went on to say that since the aim of the act is the stabilization of industry primarily through price fixing and the elimination of unfair competition, there is manifestly nothing upon which price fixing can operate where there is no price and that no price is possible where no sale can take place, stating that while coal from captive mines unquestionably affects the market none the less it is not sold on the market and therefore does not enter into direct competition with coal which is so sold. Citing the examination of Charles F. Hosford, Jr., Chairman of the former Coal Commission before the Senate Committee on Interstate Commerce,[7] the court took the position that the National Bituminous Coal Act must have been adopted with the understanding that coal from captive mines should be excluded from the regulatory provisions of the act.

#### The Legislative History of the National Bituminous Coal Act as Showing the Intent of Congress.

To refer specifically to the colloquy between Mr. Hosford and some of the Senators comprising the Interstate Commerce Committee quoted by Judge Parker in a footnote to Powell v. Gray, supra, 114 F.2d page 755, Mr. Hosford stated that the price provisions of the act, viz., the provisions of Section 4, 15 U.S.C.A. § 833, did not apply to captive coal at all. It should be noted, however, that the Bituminous Coal Conservation Act of 1935, 49 Stat. 991, 1008, § 19, defined the term "captive coal" as including all coal "produced at a mine for consumption by the

producer or by a subsidiary or affiliate thereof * * *". The National Bituminous Coal Act contains no definition of the phrase "captive coal". The definition in the 1935 act had no connection with any exemption from the operation of the act. The definition was employed for the purpose of inclusion rather than exclusion. See Section 3, the taxing section of the 1935 act. Committee reports made in connection with the 1935 act indicate very plainly that Congress intended that captive coal should be subject to its provisions. See S.Rep.No.4770, 74th Cong., 1st Sess., April 1935, p. 4, and H.R.No. 1800, 74th Cong., 1st Sess., August 1935, p. 3. The National Bituminous Coal Act, the 1937 act, in subsection (l) employs in part the language of Section 19 of the 1935 act in that it uses the words "all coal produced at a mine for consumption by the producer", but it omits the words "or by a subsidiary or affiliate thereof". We think that the inference is plain that the exemption conferred by subsection (l) is not as broad as the definition of captive coal employed for purposes of inclusion in the 1935 act and that the omission of the words last quoted from the 1937 act indicates an intention upon the part of Congress to exclude captive coal from the exemption conferred by subsection (l).[8] It should be noted that subsection (l) exempts from the price provisions of the act and the application of minimum prices or values would be without significance where title to coal never changes from the time it is mined until the time it is consumed. We think that it may be concluded that Congress regarded extensions of captive situations as undesirable. See the Hearings before the Subcommittee of the Committee on Interstate Commerce, United States Senate, 75th Cong., 1st Sess., March 2, 1937, pp. 25 and 26.

Moreover, subsection (l) was passed by the House of Representatives in its present form, but in the Senate it was amended in order to provide exemption for coal produced by producer "owned by" or "under common ownership with a producer, provided such producer does not sell any of its product on the commercial market." See Cong.Rec., Vol. 81, p. 3136, April 5, 1937. Senator Bulkley

---

[7] Hearings before Committee on Interstate Commerce, U.S.Senate, 2nd Session, 74th Congress, on S. 4638, June 3, 12 and 13, 1936, pp. 32 and 33.

[8] It should be noted that the price provisions of the 1935 act are basically the same as those of the 1937 act.

stated, "The purpose of the amendment is simply to extend the exception carried by subsection (*l*) * * *, so as to include under the definition of the word 'producer' a wholly owned subsidiary or other legal entity having identical ownership." The amendment was rejected in the conference report. See H.R.Rep.No.578, 75th Cong., 1st Sess., pp. 1, 8. It is apparent that had it been passed, the coal produced by the petitioner would have been exempt from the price provisions of the act, not as coal consumed by a "producer" but by reason of the express language of the amendment intended and designed to embrace coal from captive mines. It has frequently been held that where a proposed amendment is defeated, the legislative intent is not to be construed as embracing the effect of the language rejected. United States v. Delaware & Hudson Co., 213 U.S. 366, 414, 29 S.Ct. 527, 53 L.Ed. 836; Pennsylvania R. Co. v. International Coal Co., 230 U.S. 184, 33 S.Ct. 893, 57 L.Ed. 1446, Ann.Cas.1915A, 315; Lapina v. Williams, 232 U.S. 78, 89, 34 S.Ct. 196, 58 L.Ed. 515; Carey v. Donohue, 240 U.S. 430, 36 S.Ct. 386, 60 L.Ed. 726, L.R.A.1917A, 295; Fox v. Standard Oil Co., 294 U.S. 87, 96, 55 S.Ct. 333, 79 L.Ed. 780; United States v. United Shoe Machinery Co., D.C., 264 F. 138, 174, affirmed 258 U.S. 451, 42 S.Ct. 363, 66 L. Ed. 708.

■ There are other indicia of legislative intention which must be considered. The exemption subsection uses the word "producer". The railroad company is not a producer unless the agency rule be applied. That company possesses none of the appliances of production and nothing to produce. It owns neither the mines nor the equipment necessary for mining. It employs no miners and does no mining. Section 17(c), 15 U.S.C.A. § 847(c), defines a "producer" as one engaged in the business of mining coal. The coal company is engaged in such a business; the railroad company is not so engaged. Section 9 of the act, 15 U.S.C.A. § 839, speaks of "employees of producers of coal" and makes use of the word "producer" precisely in the sense of one who produces the product, not alone as that word is defined by the act itself but also and identically in the sense that the word is defined in any standard dictionary and is employed in common usage.

Section 10(a) of the act, 15 U.S.C.A. § 840(a), speaks of reports by "producers" and of requiring "producers" to maintain uniform systems of accounting. In the case at bar it is obvious that the statute imposes these duties upon the petitioner and not the railroad company. Indeed in the ordinary course of corporate management the railroad company could not assume these burdens without assuming in an economic sense the burden of management as well. Moreover, and this we consider very important, Section 3(a), 15 U.S.C.A. § 830 (a), imposes the tax of 1% per ton of two thousand pounds on the sale of coal and Section 3(c), 15 U.S.C.A. § 830(c), specifically provides that that tax shall be paid by the producer. The petitioner has paid this tax. Section 3(b), 15 U.S.C.A. § 830(b), imposes the tax of 19½% on the sale or disposition of coal by a producer who has not become a member of the code. Keystone has joined the code and if it had not done so and if the railroad company is to be treated as the producer for the purpose of the exemption conferred by subsection (*l*), the railroad company must be treated as the producer for all purposes of the act for the coal produced clearly would remain in interstate commerce since title to it would remain in the coal company and not vest in the railroad company. The instrumentality rule can scarcely be applied to make the Lackawanna Railroad Company an instrumentality of Keystone. The railroad company therefore would be liable for the excise tax of 19½%. In this connection it must be borne in mind that the exemption of subsection (*l*) does not run to the provisions of Section 3 for the decision of the Supreme Court in Sunshine Coal Co. v. Adkins, supra, makes it plain that the 19½% tax is applicable to non-code members. Code membership in turn being based upon production, if the railroad company does not produce, it cannot be a member of the code. Last, we advert to the most important consideration of all, which becomes apparent upon consideration of the act as a whole, that if a company which produces coal be not considered a producer because of the application of a rule of law, fictitious at best and which should not be applied for the purpose of avoiding legislative intent, the act must fail in its express purpose, declared by Section 1, 15 U.S.C.A. § 828, to be the removal

of obstructions to interstate commerce in bituminous coal.

### Conclusion.

For these reasons and with all respect to the able tribunals which have declared to the contrary, we deem the agency rule to be inapplicable and the coal company, not the railroad company, to be the producer of coal within the meaning of the act. It follows that the exemptions sought by the petitioner must be denied.

Accordingly the order of the Director is affirmed.

