BRANNAN, Secretary of Agriculture, v.
STARK et al.

DAIRYMEN'S LEAGUE CO–OPERATIVE
ASS'N, Inc., v. STARK et al.

Nos. 10365, 10366.

United States Court of Appeals
District of Columbia Circuit.

Argued March 28, 1950.

Decided Nov. 9, 1950.

Mr. Neil Brooks, Sp. Asst. to the Atty. Gen., with whom Mr. J. Stephen Doyle, Jr., Sp. Asst. to the Atty. Gen., was on the brief, for appellant in No. 10365. Mr. George Morris Fay, U. S. Atty., Washington, D. C., also entered an appearance for appellant in No. 10365.

Mr. William E. Leahy, Washington, D. C., with whom Mr. William J. Hughes, Jr., Washington, D. C., was on the brief, for appellant in No. 10366.

Mr. Edward B. Hanify, of the Bar of the Supreme Court of Massachusetts, Boston, Mass., pro hac vice, by special leave of the Court, with whom Messrs. Harry Polikoff, New York City, Edgar J. Goodrich and Lipman Redman, Washington, D. C., were on the brief, for appellees.

Messrs. Marion R. Garstang, Kansas City, Mo., and Harry Scharnikow, Washington, D. C., filed a brief for New England Milk Producers' Ass'n and others as amici curiae, urging reversal.

Before EDGERTON, CLARK and KIMBROUGH STONE,* Circuit Judges.

* Sitting by designation.

STONE, Circuit Judge.

This is an action by several milk producers (not members of milk cooperative associations) against the Secretary of Agriculture to enjoin enforcement of parts of his Order No. 4 as amended, 7 C.F.R. p. 35, 1949 ed.; 7 U.S.C.A. § 601 et seq., governing milk marketing in the Boston area. These parts of the Order provided for certain payments to milk cooperative associations from the marketing pool established by the Order. The Dairymen's League Co-operative Association, Inc. (a milk cooperative in the New York area) intervened as a defendant because similar provisions were in an Order governing that area (7 C.F.R. p. 90, 1949 ed.).

Defendant and intervener filed motions for summary judgment which was denied. There were amendments to the petition and to answers of defendant and of intervener. Evidence was introduced in the hearing, without a jury, on a permanent order.

The trial court made findings of fact, stated conclusions of law, and entered judgment permanently enjoining enforcement of the challenged provisions of the Order (Stark v. Brannan, D.C.Cir., 82 F. Supp. 614). The Secretary and the intervener brought these separate appeals. The New England Milk Producers' Association and eleven other milk cooperatives (all of which are cooperative associations marketing milk in the Boston area and qualified to receive these payments under Order No. 4) have filed a brief in this court as *amici curiae* in support of the appeals.

Before the issues as to the validity of these portions of the Order can be reached, it is necessary to dispose of an issue as to the right of plaintiffs to maintain the action. This issue contains two challenges: (1) it is not a proper class suit; and (2) it is champertous.

■ The claim that this is not properly a class suit is readily determined in so far as necessary here. The petition alleges that the plaintiffs bring the action *"for themselves* and for the benefit of all other persons similarly situated" (italics added). So far as final disposition of this case is concerned, it is of no moment whether this is properly a class action or not. This is true because the individual plaintiffs have personal claims justifying judicial consideration (Stark v. Wickard, 321 U.S. 288, 303, 305, 64 S.Ct. 559, 88 L.Ed. 733). A companion attack, by the intervener, alleges that, since the commencement of this action, "one or more of the plaintiffs" has ceased to produce milk or has become a member of the cooperative or voted in favor of such payments to cooperatives. If these allegations be true, it does not affect the standing of the other plaintiffs to maintain the suit.

■ The charge of champerty rests upon charges in an amendment to the answer of the intervener to the effect that the plaintiffs are mere nominal parties in an action brought "by and for the benefit of certain handlers of milk," who have no legal standing, and who are financing the litigation. That certain proprietary milk handlers might have financial or business interests affected by this action and that they are not in legal position to present such in court is clear from Stark v. Wickard, 321 U.S. 288, 64 S.Ct. 559, 88 L.Ed. 733. Also, this record is plain that, at least, some of the present plaintiffs are sincerely interested in maintaining their supposed rights as set out in their pleadings. Again, this record leaves little doubt that although the plaintiffs are contributing seemingly as much as they can, the bulk of the expenses of this action is being furnished by these handlers. However, this situation does not constitute champerty (139 A.L.R. 635 n. and see citations in footnotes 88-91). And even if there were— there is no proof of such—a champertous arrangement between plaintiff and these handlers, that would be no defense to plaintiffs' rights in this action (Burnes v. Scott, 117 U.S. 582, 589, 6 S.Ct. 865, 29 L. Ed. 991). The further argument that the court abused its discretion in entertaining the action is not convincing. The pressure is on the stated position of a trivial private interest opposed to public benefit. We cannot recognize that situation as here present. These *in limine* matters determined,

we come to the substantial issues in this controversy.

The broad issue is whether the Secretary exceeded his statutory powers by including in the marketing order this provision for payment to cooperatives. The statute is the Agriculture Marketing Agreement Act of 1937 (7 U.S.C.A. § 601 et seq.). While other provisions of the Act bear upon this issue, the crux of the controversy is in subsections 8c(5) and (7) (7 U.S.C.A. § 608c (5) and (7) ).[1]

As conclusions of law, the trial court stated that these provisions of the Order were not authorized by Section 8c(5) of the Act; that they were not authorized by Section 8c(7) (D) of the Act; and that they were "not incidental to and consistent with the terms and conditions specified in" Section 8c(5) and (7) of the Act and were "not necessary to effectuate the other provisions of" the Order—all of which qualities being required by the Act.

Appellant contends (1) that statutory authority for these payments to cooperatives is found in Section 8c(7) (D) of the Act; and (2) that the scope of judicial review is limited to whether substantial evidence (in the hearing before the Secretary on which he based the Order) supports this action of the Secretary.

The intervener contends that such authority is found (1) in the specific provision of 8c(7) (D), and (2) in general provisions in the Act relating to the general purpose and intent of Congress, being Sections 1, 2, 8c(18) and 10(b) (1).[2]

The Amici Curiae find such authority in 8c(7) (D).

Appellees challenge the contentions as to the scope of judicial review (stating that the basic issue is whether the payments under the terms and conditions of the Order are authorized by the Act "regardless of whether the payments are treated as related to the services specified in the Order, or are related to the other and different services now relied on by the Appellant") and that the Act permits these parts of the Order.

From these concentrated statements of the positions of the parties and of the Amici Curiae, there appear only two basic issues. The first is the scope of judicial review. The second is whether subsection 8c(7) (D) construed with 8c(5) of the Act authorizes these provisions of the Order.[3]

### Scope of Review

Appellant states this issue as follows. "The scope of judicial review is limited to the inquiry as to whether substantial evidence in the Hearing Record, on which the Secretary's Order is based, supports the Secretary's action. There being no question that substantial evidence supports the Secretary's findings that the Order provisions for payments to co-operatives are incidental and necessary under Section 8c (7) (D) of the Act, and not inconsistent with Section 8c(5), and inasmuch as the appellees failed to place the entire Hearing Record before the court, the appellees'

---

1. Hereinafter set forth in so far as pertinent.

2. These sections and subsections are, in substance, as follows. Section 1 is "Declaration of Conditions," declaring necessity for preventing disruption of exchange of commodities in interstate commerce caused by impairment of purchasing power of farmers. Section 2 declares a general policy of orderly marketing conditions to establish farm product prices equivalent to those of a base period; and of protecting consumers by gradual approach to such prices and by authorizing no higher prices. Subsection 8c (18) has to do with the factors to be considered in fixing such prices for milk. Subsection 10(b) (1) authorizes the Sec-

retary to establish committees or associations of producers; to permit producers' cooperatives to act as agents for their members and patrons in connection with distribution of their proceeds; and to accord such recognition and encouragement to producer-owned and producer-controlled cooperatives as will harmonize with the policy toward such associations set forth in existing Acts of Congress, and as "will tend to promote efficient methods of marketing and distribution."

3. The very excellent briefs filed here present many matters, but all are arguments setting forth reasons why each of these two issues should be determined for or against the Order.

attack upon the provisions of the Order must fail."

Slightly to narrow this issue, the matter of the claimed failure to "place the entire hearing record" before the trial court will have attention. The trial court found: "Slight procedural changes have been made in them [Orders]. On August 1, 1947, the rates of the payments were revised. The Secretary's original finding has never been amplified or amended." This is sustained by the only evidence, which is "there have been a few minor changes in the cooperative payment provisions." While ultimate action by the Secretary is not equivalent to the hearing records upon which the action is based, this record is clear that both the results of and the records of those later hearings were not regarded as important by either party at the trial. We shall so view them on this appeal.

■ Appellant cites cases [4] to support his argument that "as to questions of law involving the specific application of a broad statutory term, in a proceeding in which the agency administering the statute must determine it initially, the reviewing Court's function is limited, and the agency's determination, if not prohibited by the statute, is to be accepted if it is supported by substantial evidence." This argument does not solve the exact issue here. The issue is whether the requirement of payment to the cooperatives for the services, which the Secretary deemed rendered by them to this marketing plan, is "prohibited" —beyond the authority delegated to him by the Act. For the purposes of this litigation, it may be conceded that there was substantial evidence that these services were rendered. His determination that the requirement of payment for such services is within his authority under the Act is an application of the Act (as he understood it) to accepted facts. In short, it is an administrative construction of the Act.[5] While such constructions are entitled to great weight (Social Security Board v. Nierotko, 327 U.S. 358, 368, 66 S.Ct. 637, 90 L.Ed. 718), yet "An agency may not finally decide the limits of its statutory power. That is a judicial function" (Id., 327 U.S. at page 369, 66 S.Ct. at page 643, 90 L.Ed. 718). Also, Stark v. Wickard, 321 U.S. 288, 310, 64 S.Ct. 559, 88 L.Ed. 733, (this case on prior hearing in the Supreme Court). This contention is ruled against appellant.

### The Merits

■ In such issue as we have here, the tests are whether the administrative construction has " 'warrant in the record' and a 'reasonable basis in law' " (Unemployment Compensation Comm. of Alaska v. Aragon, 329 U.S. 143, 154, 67 S.Ct. 245, 250, 91 L.Ed. 136).

### (a) The Record [6]

While the Order (7 C.F.R. pp. 35-36, § 904.1, 1949 ed.) sets out various definitions, for our immediate purposes, a broad definition of the participants in the marketing area is as follows: producers (dairyherd owners), handlers (buyers of milk) and

4. The citations are Cardillo v. Liberty Mutual Insurance Co., 330 U.S. 469, 67 S. Ct. 801, 91 L.Ed. 1028; National Labor Relations Board v. Hearst Publications, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170; Dobson v. Commissioner, 320 U.S. 489, 64 S.Ct. 239, 88 L.Ed. 248; National Labor Relations Board v. Nevada Copper Corp., 316 U.S. 105, 62 S.Ct. 960, 86 L. Ed. 1305; Gray v. Powell, 314 U.S. 402, 412–413, 62 S.Ct. 326, 86 L.Ed. 301; South Chicago Coal & Dock Co. v. Bassett, 309 U.S. 251, 60 S.Ct. 544, 84 L. Ed. 732; Parker v. Motor Boat Sales, Inc., 314 U.S. 244, 62 S.Ct. 221, 86 L. Ed. 184; Rochester Telephone Corp. v. United States, 307 U.S. 125, 59 S.Ct. 754, 83 L.Ed. 1147; and Swayne & Hoyt v. United States, 300 U.S. 297, 57 S.Ct. 478, 81 L.Ed. 659.

5. As stated by Mr. Justice Reed in Social Security Board v. Nierotko, 327 U.S. 358, 369, 66 S.Ct. 637, 643, 90 L.Ed. 718: "Administrative determinations must have a basis in law and must be within the granted authority. Administration when it interprets a statute so as to make it apply to particular circumstances acts as a delegate to the legislative power."

6. In stating the "record," we are not concerned with the substantiality of the evidence but are stating what it is claimed to show pertinent to this issue of the merits.

cooperatives (the members of which are producers). Handlers may be either "proprietary" (private concerns) or cooperatives. Every cooperative is obligated to receive all milk offered by its members. Cooperatives are either "bargaining cooperatives" or "operating cooperatives." The distinction between the bargaining and the operating cooperative lies in what it does with the milk received. Bargaining cooperatives are sellers of such milk.[7] Operating cooperatives are not only such sellers but they have plants to process or manufacture milk into products, such as butter, cheese or dry casein.

Milk is classified according to its ultimate use. Class I is such as is disposed of to the consumer as a fluid. Class II is such as passes into some form of processed product. Class I is definitely worth more. Therefore, all producers (including their representative cooperatives) seek to dispose òf as much milk as possible as Class I.

The problems of milk marketing arise mainly from the biological[8] seasonal character of milk production—affected by the inherent characteristics of milk, which are fluid bulk and perishability. Another influencing factor is the occasional variation in consumption demand on particular dealers which can often not be foreseen. The main problem thus posed is to have available, at all times, enough fluid milk to satisfy the demands therefor and to dispose of surplus milk. To secure sufficient production in the short season, there inevitably results an over production for such use in the fruitful season. The reason why operating cooperatives have processing (or manufacturing) plants is to take care of this surplus production (whenever it may happen) from its members which otherwise might be mostly lost.

The reason for the existence of cooperatives is to make as much money for their producer-members as possible. This they do by consolidating the force of individual member producers in an organization which engages in numerous activities aimed to benefit its members. Some of these activities compose the basis of the factual situation here. The cooperatives make no claim that they are entitled to this disputed payment because of the services to their own members alone. Their claim is based on compensation for services which, they assert, benefit the entire market area—market-wide services.

Various witnesses have testified as to different cooperative services which they deemed of market-wide influence. By no means are all of these urged here as supporting these cooperative payment provisions in the Order. However, we will endeavor to set forth these services as completely and concisely as we can in order that the entire situation may be stated so that there may be no conscious omission from "warrant in the record" showing herein.

There are services which may (for convenience) be roughly grouped according to the character of the service, although some services in one group may have an influence in the other group. These groups are activities in connection with (1) legislation, regulations, orders (including amendments) and litigation affecting milk production and disposition; and (2) educational. In the first group are sponsoring, gathering and coordinating information for use in hearings, preparing evidence and bringing witnesses to hearings, analysis of marketing problems relative to this Order (including those arising from the operation of other milk orders in nearby marketing areas) and, broadly, keeping posted on regulatory matters affecting this area and generally. In the second group are activities connected with research, analysis and alertness as to milk market conditions and trends, and the communication of this information to their member producers and at meetings of producers.

---

7. Some bargaining cooperatives do not physically receive milk but find customers for milk which is delivered direct by the producer.

8. Cows give more milk from April to August (both inclusive), with shadings upward in March and downward in September, than they do in October to February (inclusive).

Other services are: milk tests and weights for members' milk, selling milk to handlers, supplying milk during short season, supplying milk to a handler in an unforeseen emergency, utilizing surplus milk, working for price raise to producers, and finding market for member production when his outlet is cut off.[9] Such is the "warrant in the record" of the factual situation.

(b) The Law

The crucial provisions of law are portions of § 608c(5) and (7). The former is that "In the case of milk and its products, orders issued pursuant to this section shall contain one or more of the following terms and conditions, *and (except as provided in subsection (7)) no others*" (italics added). The pertinent part of subsection (7) is that orders shall contain one or more "of the following terms and conditions: * * * (D) Incidental to, and not inconsistent with, the terms and conditions specified in subsections (5), (6) [not involved here], and (7) and necessary to effectuate the other provisions of such order." The issue of law is whether the payments for the services of the cooperatives (hereinbefore set out) are "Incidental to, and not inconsistent with" subsection (5) "and [are] necessary to effectuate the other provisions of" this Order (as required by subsection (7)). Before putting this issue to the test, it is well to understand the place of these provisions in the Act (so that they may be construed in the light of the whole Act); and to understand the general plan of the Order, of which the cooperative payments provisions are a part.

*The Act.* The basic objects of the Act are to fix minimum prices [10] for the sale of milk by producers to handlers and to set up machinery by which the price may be fixed and the price received be realized by the producer in full, subject only to such differentials and less only such deductions as are provided in the Act.

In arriving at a minimum price, the Act requires consideration of the price and availability of feeds, and "other economic conditions which affect market supply and demand for milk and its products in the marketing area"; and the prices fixed shall reflect "such factors, insure a sufficient quantity of pure and wholesome milk, and be in the public interest" (§ 608c (18)).

Also, in administration of the Act, the Secretary is directed to "accord such recognition and encouragement to producer-owned and producer-controlled cooperative associations as will be in harmony with the policy toward cooperative associations set forth in existing Acts of Congress, and as will tend to promote efficient methods of marketing and distribution" (§ 610(b)(1)).

If the Secretary finds that a marketing order will tend to effectuate the purpose of the Act, he must issue such.

There is a requirement that any order issued by the Secretary shall provide that each handler shall pay to any authority established under such order a pro rata share of the expenses necessarily incurred by such authority for its maintenance and functioning. Such share payable by a cooperative association of producers shall be based on the quantity of the commodity distributed, processed, or shipped by it (§ 610(b)(2)).

We come now to the provisions of the Act directly involved here. Section 608c (5) directs that any order shall contain "one or more of the following terms and conditions, and (except as provided in subsection (7)) no others".

Condition "A" provides for classification of milk according to its uses, fixing of minimum prices for each classified use to be paid by handlers, and times of payment. Further, that such minimum prices shall be uniform as to all handlers "subject only to adjustments for (1) volume, market, and production differentials customarily applied by the handlers subject

---

9. In addition, there are several services so exceptional or so purely for member benefit that they cannot throw weight into the balance. They are: buying milk (from members) which is below fluid milk health standards, cutting ice for non-member at cost, and guaranteeing payment to members if handlers fail to pay.

10. There is no prohibition of sale at prices above such minima.

to such order, (2) the grade or quality of the milk purchased, and (3) the locations at which delivery of such milk, or any use classification thereof, is made to such handlers."

Condition "B" directs (1) payment of "uniform prices" to all producers (including associations thereof) for milk delivered by them to the "same handler"; and (2) payment of "uniform prices" for milk delivered to "all handlers," irrespective of the use thereof made by any individual handler.

In either case, the payments are "subject * * * only to adjustments for (a) volume, market, and production differentials customarily applied by the handlers subject to such order, (b) the grade or quality of the milk delivered, (c) the locations at which delivery of such milk is made, and (d) a further adjustment, equitably to apportion the total value of the milk purchased by any handler, or by all handlers, among producers and associations of producers, on the basis of their marketings of milk during a representative period of time."

Condition "C" authorizes provision of a method "for making adjustments in payments, as among handlers (including producers who are also handlers), to the end that the total sums paid by each handler shall equal the value of the milk purchased by him at the prices fixed in accordance with paragraph (A) hereof", in order to accomplish the purposes set forth in (A) and (B).

Condition "D" is plainly irrelevant to the issues here.

Condition "E" provides (1) for furnishing market information to producers, for verification of weights, for sampling, and for testing milk purchased from producers, with "appropriate deductions therefor from payments to producers" other than cooperatives furnishing such services to their members; and (2) for assurance of, and security for, the payment by handlers to all producers for milk purchased.

Condition "F" prohibits any provision preventing cooperatives, which make collective sales or marketing of milk or of its products for its members, from blending the net proceeds of all of its sales in all markets and making distribution thereof to its producers in accordance with the cooperative contract: *provided,* it makes no sale to any handler at prices less than those "fixed pursuant to paragraph (A)".

Section 608c (7) [11] provides that "orders shall contain one or more of the following terms and conditions: * * *"

(C) authorizing selection of agencies, "and defining their powers and duties, which shall include only the powers:

"(i) To administer such order in accordance with its terms and provisions;

"(ii) To make rules and regulations to effectuate the terms and provisions of such order; * * *

"(D) Incidental to, and not inconsistent with, the terms and conditions specified in subsections (5), * * *, and (7) and necessary to effectuate the other provisions of such order."

*The Order.* The pertinent provisions of the Order are summarized by Mr. Justice Reed (Stark v. Wickard, 321 U.S. 288, 296–301, 64 S.Ct. 559, 564, 88 L.Ed. 733) as follows.

"By Order No. 4, the Secretary of Agriculture did fix minimum prices for each class of milk and required each handler in the Boston area to pay not less than those minima to producers, 7 C.F.R.1941 Supp., § 904.4, less specified deductions. §§ 904.-7(b), 904.8. In addition, the order exercised the authority granted by the statute to require the use of a weighted average in reaching the uniform price to be paid producers, as described in the preceding paragraph. §§ 904.7, 904.8.

"Under the Order, the handler does not make final settlement with the producer until the blended price has been set, although he must make a part payment on or before the tenth of each month. § 904.8. But within eight days after the end of each calendar month—the so-called 'delivery period', § 904.1(9)—the handler must re-

---

11. This subsection is not confined to milk orders but covers "Terms common to all orders" governing agricultural commodities and products included in the Act.

port his sales and deliveries, classified by use value, § 904.5, to a 'market administrator.' § 904.1(8). On the basis of these reports, the administrator computes the blended price and announces it on the twelfth day following the end of the delivery period. § 904.7(b). On the twenty-fifth day, the handlers are required to pay the balance due of the blended price so fixed to the producers. § 904.8(b).

"Were no administrative deductions necessary, the blended price per hundredweight of milk could readily be determined by dividing the total value of the milk used in the marketing area at the minimum prices for each classification by the number of hundredweight of raw milk used in the area. However, the Order requires several adjustments for purposes admittedly authorized by statute, so that the determination of the blended price as actually made is drawn from the total use value less a sum which the administrator is directed to retain to meet various incidental adjustments. In practice, each handler discharges his obligation to the producers of whom he bought milk by making two payments: one payment, the blended price, is apportioned from the values at the minimum price for the respective classes less administrative deductions and is made to the producer himself; the other payment is equal to these deductions and is made, in the language of the Order, 'to the producer, through the market administrator,' in order to enable the administrator to cover the differentials and deductions in question. * * * Apparently, this deduction for payments to cooperatives is the only deduction that is an unrecoverable charge against the producers. The other items deducted under § 904.7(b) are for a revolving fund or to meet differentials in price because of location, seasonal delivery, *et cetera*."

The portions of the Order covering these payments to cooperatives are subsections 904.10(a) and (b). Subsection 904.10(a) sets forth the method of determining that a cooperative is qualified to receive payments, and the necessary qualifications,[12] all of which must be present. Subsection 904.10(b) sets forth the rate of payments to qualified cooperatives, which payment is "from the funds provided by handlers' payments to the market administrator pursuant to § 904.9"—that is, from the producer settlement fund (or "pool") referred to by Mr. Justice Reed at pp. 301 and 308 of 321 U.S., 559 of 64 S.Ct., 88 L.Ed. 733, of Stark v. Wickard. These rates for bargaining cooperatives and for operating cooperatives are set forth in paragraphs (1) and (2) respectively of this subsection.[13]

12. The necessary qualifications are as follows:

"(1) It conforms to the requirements relating to character of organization, voting, dividend payments, and dealing in products of nonmembers, which are set forth in the Capper-Volstead Act [7 U. S.C.A. §§ 291, 292] and in the state laws under which the association is organized.

"(2) It operates as a responsible producer-controlled marketing association exercising full authority in the sale of the milk of its members.

"(3) It systematically checks the weights and tests of milk which its members deliver to plants not operated by the association.

"(4) It guarantees payment to its members for milk delivered to plants not operated by the association.

"(5) It maintains, either individually or together with other qualified associations, a competent staff for dealing with marketing problems and for providing information to its members.

"(6) It constantly maintains close working relationships with its members.

"(7) It collaborates with similar associations in activities incident to the maintenance and strengthening of collective bargaining by producers and the operation of a plan of uniform pricing of milk to handlers.

"(8) It is in compliance with all applicable provisions of this order."

13. These paragraphs are as follows:

"(1) Each qualified association shall be entitled to payment at the rate of 1 cent per hundredweight on the milk which its producer members deliver to the plant of a handler other than a qualified association; except on milk delivered by a producer who is also a member of another qualified association, and on milk delivered to a handler who fails to make applicable payments pursuant to § 904.9(b) (2) and § 904.11 within 10 days after the end of the month in which he is required to do so. If the handler is required by

Having stated the germane parts of the Act and the general plan and pertinent portions of the Order, we pass to the determination of whether—in the setting of all pertinent provisions of the Act and of the Order—the Act permits payments from these producers to cooperatives for the services hereinbefore set forth from the record. This imposes that we approach this problem with an attitude enjoined by the Act. The considerations creating that attitude are as follows.

The Act did not stop with declaring a policy and leaving to the Secretary of Agriculture to devise methods of making that policy effective. Congress had in mind the then recent case of Schechter Poultry Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, which had denied such broad delegation of legislative power to administrative agencies. That decision allowed "flexibility and practicality" in the effectuation of legislative policy by administrative action, but it required that Congress should declare the "standards" to be applied and should "prescribe limits" to the making of subordinate rules by the administrative body (295 U.S. at pp. 530, 541, 55 S.Ct. at page 843, 79 L.Ed. 1570).

This Marketing Act was carefully drawn to meet these constitutional requirements. It provided that its policies might be worked out through market Orders. It stated, with particularity, what such orders must or might contain and expressly denied all others. The sole general expression of grant of power as to such orders is that authorizing provisions "Incidental to, and not inconsistent with, the terms and conditions specified in subsections (5), (6), and (7) and necessary to effectuate the other provisions of such order" (Section 608c (7) (D)). The measuring standard words are "incidental," "not inconsistent," and "necessary."

The matter here is payments from the pool. These payments *come out of* the money receivable from the pool by *all producers,* including non-members of qualified cooperatives. They *go to producers* who are members of qualified cooperatives.

The statutory purpose (as to producers) is to secure to producers at least the fixed minimum price less only the costs of administration and qualified by individual producer differentials (such as quality of milk, location, *et cetera*) (§ 608c(5) (A)).

The administrator of the market has various duties, among which the Act specifies furnishing marketing information to producers, supervising the weighing, testing and sampling of milk, and assuring payment by handlers to producers for milk purchased (§ 608c(5) (E)). The costs of administration come from the handlers (§ 610(b)(2)); and, for furnishing these services of marketing information, weighing, sampling, and testing of milk, "appropriate deductions therefor from payments to producers" (other than those for whom such services are rendered by qualified cooperatives) are authorized (§ 608c(5) (E)).

The prime purpose of the Act is to establish prices for the agricultural commodities (including milk) covered by the Act (§ 602) measured by a base period of time (§ 608e). The particular requirements as to milk prices are set out in subsections 608c(5) (A) and (B) and 608c (18). All of the provisions in the Act, which affect milk, are directed to this prime purpose. Therefore, any charge or arrangement which reduces the price received by the producer—other than those expressed in the Act—must be jealously scrutinized. This attitude is not only enjoined by the broad purposes of the Act, but it is directed expressly by the limitations in subsection 608c(7) (D) which require not only that a provision in an

paragraph (e) of this section to make deductions from members of the association at a rate lower than 1 cent per hundredweight, the payment pursuant to this subparagraph shall be at such lower rate.

"(2) Each qualified association shall be entitled to payment at the rate of 2 cents per hundredweight on milk received from producers at a plant operated by that association."

order shall be "incidental" and "not inconsistent" but shall be "necessary" to effectuate the order.

With this attitude and in the light of the pertinent provisions of the Act and of the Order, we examine these charges and the services (shown in the Record) urged as justification therefor. As to the activities grouped hereinbefore as "legislation, regulations, orders (including amendments) and litigation affecting milk production and disposition," and grouped as "educational," there is small basis for argument. Primarily, all of these services are for the benefit of the cooperative members—that benefit flowing often from bettering marketing conditions. The very nature of these activities repels the thought that the Congress intended such to be compensated by deductions against some producers. Section 608c(5) (E) defines clearly the kind of market services for which deductions from payments due only to a portion of the producers may be made. Many of the services here, except litigation, are properly covered by the requirement (§ 608c(5) (E)) that the administrator furnish marketing information to producers, in which case the subsection provides for payment to the administrator therefor by producers not so supplied by qualified cooperatives, leaving members of such cooperatives subject only to the disposition of such associations. As to litigation, the existence of this suit is proof that such assistance by cooperatives may or may not serve the producers as a whole or only the cooperatives in opposition to independent producers. It is argued that it would take a decided increase in the present staff of the administrator to provide these services and that such increase would be expensive. This is no answer. The Act makes it the duty of the administrator to do this. He cannot farm out these duties to one class of producers at the expense of another class, for this would violate the effect of uniformity of price required in subsections 608c(5) (B) (i) and (ii) and be "inconsistent" therewith. Also, insofar as these services are market-wide useful, the cooperatives are not alone in furnishing such. Some handlers maintain staffs of experts and they, as well as independent producers, contribute similar kinds of services to the market in which all are vitally interested. Such handlers and producers receive no allowance therefor.

As to milk tests, weights and samples, charges for such are covered by subsection 608c(5) (E), both as to members and as to non-members of cooperatives.

Two other factors are (1) working for price increases to producers and (2) finding market for a member's production when his normal outlet is cut off. Important as it is to producers to have better prices, it is not reasonable that such activities by themselves can be a basis for this payment. All producers must, naturally, want to realize as much for their milk as possible. Because of their combined, organized, and directed force, it is evident that cooperatives would have greater influence in the market than independent producers. However, that is no reason why payments should be made therefor by the independents to members of the cooperatives. Payment for such services is "not consistent" with nor "necessary" to the effectuation of an Order. The other of these two factors is so almost entirely a member benefit that it should be put aside.

We have considered hereinbefore various services deemed by witnesses as being bases for this payment to cooperatives. One purpose in so doing has been to cover all services (mentioned in this record) as completely as may be; and another purpose is to dispose of such as seemed clearly insufficient in order, by such elimination, to get down to those services which are the main reliance to support these payments. All of the services first hereinbefore set out and which have not yet been disposed of may be put into two classifications. They have been well defined by witness Chester W. Smith as follows.

"It seems to us these services can be grouped into two general groups. There are services in the market with respect to actual selling operations or what is commonly called the making of milk available for Class I use in the market.

"The other main category is on the country end, or what is commonly referred to as the service of offering producers a market for their milk at all times."

In short, they are adequate market supply of fluid milk, particularly in the short production season, and disposition of surplus supply at all times but particularly in the fruitful season.[14] In either aspect, the problem is one of surplus fluid milk—either for supplying the market or of utilization to save loss of milk beyond market demand therefor. There is no doubt that these services are pronounced aids to all participants in the marketing area—producers, handlers and consumers. This is so clear that it serves no purpose to describe the helpful effects in detail. However, the certainty that these services are beneficial does not determine the issue here of payment therefor in the manner set out in the Order. Helpfulness is not the statutory measure. Those tests are "incidental", "not inconsistent" with, and "necessary." "Necessary" is a harsher requirement than merely beneficial.

Whether the power to provide this payment to cooperatives is "incidental" depends, of course, upon the meaning of that word as used here. The definition given in decisions has varied according to the situation and the statute or instrument to be construed (20 Words and Phrases, pp. 418-434). Probably as good a definition as any, in our situation, is "Certainly, an incidental power can avail neither to create powers which, expressly or by reasonable implication, are withheld nor to enlarge powers given; but only to carry into effect those which are granted" (First National Bank v. State of Missouri, etc., 263 U.S. 640, 659, 44 S.Ct. 213, 216, 68 L.Ed. 486). By such definition, this payment is not authorized to carry into effect the powers granted the Secretary under the Act but is opposed to the express requirement of uniform prices to producers subject only to the deductions and differentials set out in the Act.

That this payment is not "not inconsistent" is determined by what has last been above stated.

That the payment is not "necessary" is clear from the evidence in this record. The evidence is as follows. The purpose of cooperatives in furnishing these services is to benefit their members. It is impractical, if not impossible, to provide these services to the market for the benefit of members without also benefiting other producers in the market. The cooperatives have been providing these services for many years—long before any regulation of milk marketing by the Congress. There has been no material change therein since such regulation. They can so continue without these payments. The basis of the claims for such payments is not "necessity" but the *equity* of the situation. This equity is that the non-members get the benefit of such services and should share the expense thereof, even though the reason for furnishing such services is to benefit members. The statutory requirement of "necessary to effectuate the other provisions of such order" (§ 608c(7) (D)) is not met.

■ Each side urges support in certain legislative history. This history has to do with two matters: (1) the enactment of this Act; and (2) a proposed amendment thereof. As to the first, the bases are the Senate Report and statements on the floor by the committee chairman. Appellees contend that these show that the Congress (influenced by the then recent Schechter v. United States decision) was carefully and particularly setting out just what an order by the Secretary might include and nothing more. This contention is, generally speaking, true. However, it does not solve our problem but has the effect (as hereinbefore stated) of enjoining upon the Secretary and the Courts a jealous scrutiny of provisions in an order which are not clearly within the power granted to the Secretary in the Act.[15]

---

14. An occasional service in connection with supply is the furnishing of milk to a handler in an emergency caused from a temporary abnormal demand by his customers. This may occur in either season.

15. A further consideration bears upon this legislative history. Congress was thor-

The second matter is an attempted amendment of the Act in 1940 by Senate Bill 3426. This Bill clearly authorized payments by non-members to qualified cooperatives for market-wide services. In 1938, the Secretary included such payments in an order regulating the New York market area. This provision, *inter alia*, was promptly involved in litigation (United States v. Rock Royal Co-op., Inc., D.C., 26 F.Supp. 534, 553) resulting in a final decision (307 U.S. 533, '59 S.Ct. 993, 83 L.Ed. 1446) June 5, 1939, that handlers could not challenge this provision but that producers could. The Supreme Court expressly refrained from any discussion of the merits as to such payments. In this setting of challenge and of uncertainty as to the power of the Secretary to include such a provision in a milk order, Senate Bill 3426 was introduced. Those lined with appellant contend that this Bill was merely to clarify and place beyond controversy a power already in the Act. Appellees contend it was intended to add a new power not in the Act. It might have been either. The Bill passed the Senate and got no further. Expressions of proponents at committee hearings are not of influence here. The nearest pertinent expression in the committee report (S. Rep. No. 1719, Seventy-sixth Congress, Third Session) is as follows: "This authority is considered as being involved in the power to fix minimum prices to handlers and the manner of making payments to producers already contained in the act. Hence, the purpose of section 4 is to establish more explicit standards by which the Secretary shall be guided in providing for such compensation. Both types of services are definitely associated with the proper functioning of an order program and the effectuation of the policy of the act." This statement in the report is not very helpful here either way. While the last sentence, standing alone, would broadly favor appellant, as a legislative construction of the Act; yet it is equally favorable to appellees as a reason for the amendment, appearing as it does in a report supporting the proposed amendment. As to the possible effect (which we do not determine) of failure to pass this amending Bill, compare Federal Trade Commission v. Bunte Bros., 312 U.S. 349, 352, 61 S.Ct. 580, 85 L.Ed. 881; Fox v. Standard Oil Company, 294 U.S. 87, 96, 55 S.Ct. 333, 79 L.Ed. 780; Carey v. Donohue, Trustee, 240 U.S. 430, 436–437, 36 S.Ct. 386, 60 L.Ed. 726; Pennsylvania R. Co. v. International Coal Co., 230 U.S. 184, 198, 33 S.Ct. 893, 57 L.Ed. 1446; United States v. Delaware and Hudson Co., 213 U.S. 366, 414, 29 S.Ct. 527, 53 L.Ed. 836; Keystone Mining Co. v. Gray, 3 Cir., 120 F.2d 1, 10; and Fleming v. Hawkeye Pearl Button Co., 8 Cir., 113 F.2d 52, 58. We conclude that this subsequent legislative history is no assistance in construing the Act.

Another argument favoring appellant is that these payments to cooperatives were accompanied by a reduction in allowable handlers' charges; with the result, that the producer was at little if any more expense than before. This argument might be pertinent in connection with the reasonableness of the Order. It has no bearing upon the validity.

## Conclusion

The judgment (here appealed) was stayed on condition that the Market Distributor for this area deposit "all sums representing monthly deductions from the equalization pool" made in accordance with "Sections 904.10 (a)-(d) and 904.8 (b) (5) of said Order" in a special bank account to await the final result of this litigation.

oughly familiar with the importance of producer cooperatives in the marketing of milk. Reference to them occurs repeatedly in the Act. Congress must have known of the significance in the marketing of milk, of these long established activities of cooperatives in connection with supply and surplus. When Congress was endeavoring to conform to the Schechter case decision in setting forth the powers of the Secretary, it is little short of remarkable that it would leave, unexpressed in the Act, the grant of this power to compel these new and drastic payments by non-members to qualified cooperatives. Compare First National Bank in St. Louis v. State of Missouri, 263 U.S. 640, 657, 44 S.Ct. 213, 68 L.Ed. 486.

With directions to dispose of this fund and otherwise to proceed in accordance with this opinion, the judgment is

Affirmed.

EDGERTON, Circuit Judge, (dissenting).

The order authorizes payments to a cooperative association only when the Secretary has determined that the association meets the following requirements, among others: "* * * (2) It operates as a responsible producer-controlled marketing association exercising full authority in the sale of the milk of its members. * * * (5) It maintains, either individually or together with other qualified associations, a competent staff for dealing with marketing problems * * * (7) It collaborates with similar associations in activities incident to the maintenance and strengthening of collective bargaining by producers and the operation of a plan of uniform pricing of milk to handlers." These services contribute to the stabilizing of what had been a chaotic and depressed industry. They tend to benefit all milk producers. Individuals cannot perform these services for themselves.

The Secretary found that payments to cooperatives that perform these services are incidental to and not inconsistent with the terms and conditions of § 8c(5) of the Act and necessary to effectuate the other provisions of the order. I think he was not unreasonable in so finding and not wrong as a matter of law. "Necessary" does not always mean "indispensable", "essential", or "vital". Armour & Co. v. Wantock, 323 U.S. 126, 129, 65 S.Ct. 165, 89 L.Ed. 118. Its meaning varies with the context. A night watchman for a manufacturing company has been held "necessary for production" within the meaning of the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq., Walton v. Southern Package Corp., 320 U.S. 540, 64 S.Ct. 320, 88 L.Ed. 298, and prohibition of industrial home work has been upheld as "necessary" to an effective minimum-wage order. Gemsco, Inc. v. Walling, 324 U.S. 244, 65 S.Ct. 605, 89 L.Ed. 921. "All that is needed to support the [Secretary's] interpretation is that it has 'warrant in the record' and a 'reasonable basis in law' ". Unemployment Compensation Commission of Alaska v. Aragon, 329 U.S. 143, 153-154, 67 S.Ct. 245, 250, 91 L.Ed. 136. I think his interpretation meets this requirement; the more clearly because the Act directs him to "accord such recognition and encouragement to producer-owned and producer-controlled cooperative associations as will be in harmony with the policy toward cooperative associations set forth in existing Acts of Congress, and as will tend to promote efficient methods of marketing and distribution." 49 Stat. 767, 7 U.S.C.A. § 610(b)(1).