**Oscar L. GRANT et al., Appellants,**

v.

**Ezra Taft BENSON et al., Appellees.**

**Ezra Taft BENSON et al., Appellants,**

v.

**Oscar L. GRANT et al., Appellees.**

Nos. 12478, 12498.

United States Court of Appeals
District of Columbia Circuit.

Argued May 25, 1955.

Decided Dec. 8, 1955.

Writ of Certiorari Denied
April 9, 1956.

See 76 S.Ct. 658.

Messrs. Willis F. Daniels, of the bar of the Supreme Court of Pennsylvania, Harrisburg, Pa., pro hac vice, by special leave of Court, and Harry Polikoff, New York City, with whom Mr. Lipman Redman, Washington, D. C., was on the brief, for appellants in No. 12478 and appellees in No. 12498.

Messrs. Bernard L. Goodman and George Herbert Goodrich, Washington, D. C., also entered appearances for appellants in No. 12478 and appellees in No. 12498.

Mr. Neil Brooks, Sp. Asst. to Atty. Gen., U. S. Dept. of Justice, with whom Messrs. J. Stephen Doyle, Jr., Sp. Asst. to Atty. Gen., U. S. Dept. of Justice, and Donald A. Campbell, Atty., U. S. Dept. of Agriculture, were on the brief, for Ezra Taft Benson, appellee in No. 12478 and appellant in No. 12498.

Mr. Keith L. Seegmiller, Washington, D. C., for Daniel J. Carey, Commissioner. of Agriculture and Markets of the State of New York, appellee in No. 12478 and appellant in No. 12498.

Mr. Frederic P. Lee, Washington, D. C., filed a brief on behalf of Adams Producers Cooperative, Inc., and others, Metropolitan Cooperative Milk Producers' Bargaining Agency, Inc., and Mutual Federation of Independent Cooperatives, Inc., appellees in No. 12478 and appellants in No. 12498.

Mr. Marion R. Garstang, Washington, D. C., filed a brief on behalf of National Milk Producers Federation, as amicus curiae, in support of the judgment.

Mr. H. Keith Eisaman, Washington, D. C., filed a brief on behalf of Eastern Milk Producers Cooperative Association, Inc., as amicus curiae, in support of the stay pending appeal and urging reversal of the judgment.

Before PRETTYMAN, FAHY and DANAHER, Circuit Judges.

FAHY, Circuit Judge.

The appeals involve the validity of payments authorized by certain parts of an Order regulating the marketing of milk in the New York Metropolitan Milk Marketing Area. The District Court sustained the payments as valid. The Order which provides for them, known as Order No. 27, 7 C.F.R. §§ 927.1 et seq. (1952), as amended, 7 C.F.R. §§ 927.1 et seq. (Supp.1955), was issued originally by the Secretary of Agriculture in 1938, effective upon the issuance of a like order by the Commissioner of Agriculture and Markets of the State of New York, as part of a joint federal-state program. See 3 Fed.Reg. 1945–1951 (1938). The Secretary acted under the purported authority of the Agricultural Marketing Agreement Act of 1937, c. 296, 50 Stat. 246, as amended, 7 U.S.C. § 601 et seq., (1952), 7 U.S.C.A. § 601 et seq. The suit arose on complaint of six dairy farmers whose marketing of milk is regulated by the Order. They sought to enjoin the Secretary [1] from making

---

1. We refer only to the Secretary in the text of the opinion. Reference to other appellees, who are officials concerned with the administration of the Order, is omitted for purposes of simplicity. The Commissioner of Agriculture and Markets of the State of New York and certain cooperative associations and federations of such associations were permitted to intervene in the District Court and are appellees in No. 12478 and appellants in No. 12498.

payments under section 927.76 of the Order to cooperative associations of milk producers or federations of such associations. The plaintiffs attacked this provision as unauthorized by the federal statute. After hearing and upon the basis of findings of fact and conclusions of law the District Court held for the Secretary and other defendants and entered judgment dismissing the complaint. The appeal in No. 12478 is from this judgment. *Pendente lite* the District Court issued a preliminary injunction requiring the Secretary and the Market Administrator to withhold and place in escrow portions of the payments in question. Upon dismissing the complaint the court vacated this injunction but stayed its action pending the appeal of plaintiffs in No. 12478. In No. 12498 the Secretary appeals from this stay order. The escrow fund has accumulated in the amount of over $1,500,000.

The Order is one of a number covering milk marketing areas in various parts of the United States. Stark v. Wickard, 321 U.S. 288, 64 S.Ct. 559, 88 L.Ed. 733, which also arose in this jurisdiction,[2] contains a general description of the purposes and nature of such orders. They set forth programs that are designed "to stabilize the price of milk, in aid of both producers and distributors or handlers, and to maintain orderly marketing conditions." United Milk Producers of New Jersey v. Benson, 96 U.S.App.D.C. 227, 225 F.2d 527, 529. As we there also said,

"*  *  * The validity of the statute and of particular marketing orders made under its terms has been upheld in opinions which elaborate the legal and economic aspects of the program. United States v. Rock Royal Co-op, 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446; H. P. Hood & Sons v. United States, 307 U.S. 588, 59 S.Ct. 1019, 83 L.Ed. 1478."

A general description of Order No. 27 is perhaps desirable before turning to its particular provisions under attack. The Order has many features in common with others which have been before the courts. The purpose of the Order as described in the Secretary's brief, not controverted in this respect, is to establish uniform minimum prices to be paid by handlers and uniform prices to be paid to producers. The first aim is achieved by setting uniform minimum prices for each milk use classification, such as fluid milk, cream, and various manufactured milk products. Thus the price paid by the handler is geared to the use which he makes of the milk. In contrast, the marketing plan is designed to give the producer a uniform price for all the milk he sells regardless of the use made of it by the handlers who purchase it. Several steps are involved in reaching this uniform price. The Market Administrator computes the value of milk used by each pool handler by multiplying the quantity of milk he uses in each class by the class price and adding the results. The values for all handlers are then combined into one total. That amount is decreased or increased by several subtractions or additions, including a deduction for payments to cooperatives for marketwide services, the payments here under attack. The result is divided by the total quantity of milk that is priced under the regulatory program. The figure thus obtained is the basic or uniform price which must be paid to producers for their milk. Each handler whose own total use value of milk for a particular delivery period, i. e., a calendar month, is greater than his total payments at the uniform price is required to pay the difference into an equalization or producer-settlement fund. Each handler whose own total use value of milk is less than his total payments to producers at the uniform price is entitled to withdraw the amount of the difference from the equalization or producer-settlement fund. Thus a composite or uniform price is effectuated by means of the equalization or producer-settlement fund.

2. See 78 U.S.App.D.C. 44, 136 F.2d 786.

The payments to cooperative associations[3] of producers sought to be enjoined are specified in section 927.76 of the Order.[4] The payments are subject to elaborate qualifications the cooperatives must meet with respect to services and reporting. To understand better the place of the cooperatives in the total scheme, some of the findings of the Secretary, made after extensive administrative hearings, are now outlined. See 18 Fed.Reg. 6458–6465 (1953). The Secretary found that the milk supply for the New York Metropolitan Milk Marketing Area is produced by approximately 50,000 dairy farmers scattered over six states in a milkshed which extends more than 400 miles from the marketing area. The value of the milk whose price has been regulated in this area has in recent years exceeded $300,-000,000 annually. The volume of milk was approximately seven billion pounds in the year 1952. Price fixing under this huge program is not static; it requires constant attention. Problems in the vast milkshed emphasize the need for active participation in the program by producers. Producer groups must be prepared day by day to submit detailed data as to the market situation, so that the total milk supply will be properly utilized and the greatest return will be brought to all producers under the marketwide pool. The interests of proprietary handlers, a small group, are well represented. In the absence of informed participation by producers they would be at a disadvantage, a result which would be inconsistent with the statutory scheme and with the public interest. But the 50,000 individual producers are not generally able to attend the numerous hearings which it is necessary to hold from time to time on proposed amendments to the Order. The individual dairy farmer, moreover, does not have available the technicians and data necessary to effective representation of his interests at these meetings. He cannot with his limited means maintain the staff necessary to initiate requests for amendments and keep informed as to current market conditions and other changing circumstances in the highly complex field of milk marketing. Therefore active participation by producers under this program is feasible, as was here expressly found, only by means of cooperative associations of producers. Such cooperatives are required to perform the aforementioned marketwide services in order to qualify for the contested payments. In addition, they may be required to channel their milk into those utilizations that are most advantageous to the marketwide pool, thereby enhancing the value of the pool to the advantage of all producers in the milkshed. Finally, some cooperatives maintain manufacturing plants necessary to insure an outlet for the surplus milk which presents a recurring problem in the highly seasonal milk market. Thus it must be concluded that the cooperatives as a group advance the interests of producers generally throughout the milkshed. To the extent that producers' interests in the classification, pricing and pooling provisions of the Order may differ, such multiple interests are represented by the cooperatives, for they are distributed throughout the milkshed and are of various types and sizes. Without the payments to cooperatives the cost of marketwide services rendered by them must be borne exclusively by their members, engendering an unfair disparity between members and nonmembers. All producers receive the value of the marketwide services and should pay for them on the same pro rata basis without regard to whether or not

3. We use interchangeably the expressions "cooperatives," "cooperative associations" and "federations of cooperative associations," for, though they may differ in composition, the differences are not material for purposes of this case.

4. This section of the Order went through amendment during the course of the litigation. The complaint was filed in March, 1952, at which time § 927.76 was in the text originally adopted. See 7 C.F.R. § 927.76 (1952). It was altered by amendment effective December 16, 1953, see 7 C.F.R. § 927.76 (Supp.1955), after which the complaint was also amended to cover the changed situation.

they happen to be members of the cooperative associations which perform the services. The cooperatives are under the constant scrutiny of the Market Administrator, and upon failure to perform the specified services the payments are discontinued. The cooperatives incur expenses in the performance of marketwide services at least equal to the amounts received as payments from the equalization or producer-settlement fund. Approximately 70 per cent of the producers are members of cooperative associations, and the value of the marketwide services is worth more to each producer than the small sum paid to the cooperatives.[5]

These findings of the Secretary, we repeat, were based on evidence taken at extensive hearings. At these hearings analyses of many experts were received. The record of the hearings, with the findings and conclusions of the Secretary, was before the District Court. The court found that the findings and conclusions of the Secretary were based on and supported by substantial evidence in the record of the hearings, which was certified by the Secretary to the court for review and was received in evidence as the hearing record upon the basis of which the court was to render its decision. Cf. National Broadcasting Co. v. United States, 319 U.S. 190, 227, 63 S.Ct. 997, 1014, 87 L.Ed. 1344, 1368. On the whole record the court held that the challenged provisions are authorized by the statute.

Appellants in their main brief in this court do not challenge as unsupported by the evidence the findings of fact of the Secretary or of the court. In their reply brief they do seem to question the correctness of some of the Secretary's findings, but we understand their contention actually to be that the findings are immaterial and not a substitute for the alleged lack of statutory authority. In other words, their position is that the pay-

ments, and the provisions of the Order authorizing them, are unauthorized by the statute. In any event, we accept the findings of fact of the court below, and therefore of the Secretary, as supported by substantial evidence in light of the record as a whole. This leaves for consideration the question of statutory authority upon which appellants rest their case.

Section 8c(5) of the Act[6] provides that in the case of milk and its products,

"* * * orders issued pursuant to this section shall contain one or more of the following terms and conditions, and (except as provided in subsection (7) of this section) no others:

"(A) Classifying milk in accordance with the form in which or the purpose for which it is used, and fixing, or providing a method for fixing, minimum prices for each such use classification which all handlers shall pay * * * for milk purchased from producers or associations of producers. Such prices shall be uniform as to all handlers, subject only to adjustments for (1) volume, market, and production differentials customarily applied by the handlers subject to such order, (2) the grade or quality of the milk purchased, and (3) the locations at which delivery of such milk * * * is made to such handlers.

"(B) Providing:

"(i) for the payment to all producers and associations of producers delivering milk to the same handler of uniform prices for all milk delivered by them * * *."

Subsection (7) of section 8c provides that orders shall contain "one or more of the following terms and conditions," followed by an enumeration including

---

**5.** The average annual expenditure per producer for the payments is approximately $25.00, while a change of only 1% in the uniform price affects the annual income of a producer by more than $60.00.

**6.** 49 Stat. 754–755, as amended and reenacted, 7 U.S.C. § 608c(5) (1952), 7 U.S.C.A. § 608c(5).

subsection (D) of subsection (7), which reads as follows:

"(D) Incidental to, and not inconsistent with, the terms and conditions specified in subsections (5)–(7) of this section and necessary to effectuate the other provisions of such order."

We agree with the District Court that these provisions of the statute support the challenged terms of the Order. Those terms as we have seen authorize payments to cooperative associations or federations thereof for marketwide services performed by them for the benefit of all producers, which includes the appellants. As we have also seen the Secretary under the statutory provisions is authorized to devise a "method" for fixing minimum prices for each use classification of milk, and all handlers must pay those prices for milk purchased from producers or associations of producers. The statute also directs, on the other hand, that the prices to be received by the producers are to be uniform, irrespective of the use made of the milk by the individual handler purchasing it. The orders made under the statute may contain terms incidental to and not inconsistent with the foregoing provisions, and necessary to effectuate them. It is incidental to, not inconsistent with, and necessary to effectuate both the method for setting class prices and the provisions for establishing a uniform price, that the Order provide for payments to cooperatives for services which are beneficial to all producers and reasonably necessary to the successful operation of the complicated program. Uniformity in the price received by producers is not destroyed by such payments. On the contrary, the findings are that the services for which they are made are of a marketwide character, and are of greater value to each producer than the small amount paid by him as his contribution to the cost. Further, it is found that the cooperatives incur expenses in the performance of these marketwide services at least equal to the amount received from the fund. If the payments were for services beneficial only to members of the associations the case would be different. But they are for the benefit of nonmembers as well, and they are shown by massive evidence which we cannot ignore, followed by findings which we have no authority, rightfully exercised, to overturn, to be reasonably necessary to accomplish the purposes of the statute through the method adopted.

Appellants contend, nevertheless, that the decision of the Supreme Court in Brannan v. Stark, 342 U.S. 451, 72 S.Ct. 433, 96 L.Ed. 497, requires disapproval of the payments. We think this contention rests upon a misreading of that decision in its relation to the present Order. There the Supreme Court disapproved payments to cooperatives authorized by an Order for the Boston area.[7] That Order was issued under the same statute as was the Order in this case. While there is some language in Stark which might seem opposed to our decision, the facts there were so critically different from those in this case that such language must be deemed inapplicable. In the first place, most of the qualifying conditions imposed upon cooperatives by the Boston Order showed on their face that the services to be performed by the cooperatives were designed to aid only their members.[8] With ref-

---

7. For an earlier history of the case, on the question of standing, see Stark v. Wickard, supra, and, in this court, Brannan v. Stark, 87 U.S.App.D.C. 388, 185 F.2d 871.

8. The Court, quoting 7 C.F.R. § 904.10(a) (Supp.1947), listed these conditions as follows:

" '(1) It conforms to the requirements relating to character of organization, voting, dividend payments, and dealing in products of nonmembers, which are set forth in the Capper-Volstead Act [7 U.S.C.A. §§ 291, 292], and in the state laws under which the association is organized.

" '(2) It operates as a responsible producer-controlled marketing association exercising full authority in the sale of the milk of its members.

" '(3) It systematically checks the weights and tests of milk which its

erence to these conditions the Court said, "But none of these shows any indication that the activity it prescribes will benefit nonmembers, with the possible exception of the seventh * * *." 342 U.S. at page 459, 72 S.Ct. at page 437. The Court then disposed of the seventh requirement by stating that even if it comprehended a service to nonmember producers substantial enough to be significant in determining the validity of the mandatory contribution from them to cooperatives, "it does not support the exaction in issue, which concededly is based mainly upon other services primarily performed for members." 342 U.S. at page 460, 72 S.Ct. at page 438. In this case, however, the marketwide nature and effect of the services to be performed by the cooperatives appear plainly from the text of the Order, and it is these services upon which the Secretary relies to justify the payments. Thus, for example, one of the requirements is "conducting a comprehensive educational program among producers—i. e., members and nonmembers of cooperatives—and keeping such producers well informed for participation in the activities under the regulatory order and, as a part of such program, issuing publications that contain relevant data and information about the order and its operation, and the distribution of such publication to members and, on the same subscription basis, to nonmembers who request it, and holding meetings at which members and nonmembers may attend; * * *." 7 C. F.R. § 927.76(e) (Supp.1955).[9]

In the second place, the Supreme Court did not have before it in the Stark case detailed findings of the Secretary and the District Court to the effect that the services performed by cooperatives are marketwide and are of great benefit to nonmembers as well as members. The record in this case, however, includes such findings, and they are well supported by the evidence. Hence we cannot conclude, as did the Court in Stark, that the activi-

---

members deliver to plants not operated by the association.

"'(4) It guarantees payment to its members for milk delivered to plants not operated by the association.

"'(5) It maintains, either individually or together with other qualified associations, a competent staff for dealing with marketing problems and for providing information to its members.

"'(6) It constantly maintains close working relationships with its members.

"'(7) It collaborates with similar associations in activities incident to the maintenance and strengthening of collective bargaining by producers and the operation of a plan of uniform pricing of milk to handlers.

"'(8) It is in compliance with all applicable provisions of this subpart.'" 342 U.S. at page 459 note 9, 72 S.Ct. at page 437.

9. The other qualifications are: "(1) Analyzing milk marketing problems and their solution, conducting market research and maintaining current information as to all market developments, preparing and assembling statistical data relative to prices and marketing conditions, and making an economic analysis of all such data; (2) determining the need for the formulation of amendments to the order and proposing such amendments or requesting other appropriate action by the Secretary or the market administrator in the light of changing conditions; (3) participating in proceedings with respect to amendments to the order, including the preparation and presentation of evidence at public hearings, the submission of appropriate briefs and exceptions, and also participating, by voting or otherwise, in the referenda relative to amendments; (4) participating in the meetings called by the market administrator, such as meetings with respect to rules and regulations issued under the order, including activities such as the preparation and presentation of data at such meetings and briefs for submission thereafter; * * * (6) in the case of a cooperative or federation which receives an additional payment under paragraph (f) (4) or (5) of this section, operating marketing facilities, i. e., pool plant(s), at which is received at least 25 per centum, by weight, of the milk marketed by all the members of the cooperative or by all the members of the federated cooperatives." 7 C.F.R. § 927.76(e) (Supp.1955). Note should also be taken of the bases for disqualifying a cooperative, 7 C.F.R. § 927.76(g) (Supp.1955), one of which is discussed in the text, infra.

ties required of cooperatives are only of incidental benefit to nonmembers.

Finally, particular note must be taken of the difference between the Boston Order and the New York Order regarding the services to be performed by cooperatives in securing outlets for surplus milk and in disposing of milk so as to bring the highest net return to the fund. The significance of the difference is enhanced by the fact that the Court in Stark explicitly contrasted the Boston Order with the New York Order in this respect, pointing out that the latter expressly requires that an association to qualify for the payments "must arrange for and supply 'in times of short supply, Class I milk to the marketing area,' and must secure 'utilization of milk, in times of long supply, in a manner to assure the greatest possible return to all producers.' 7 CFR, 1950 Cum.Supp., § 927.9(f)." 342 U.S. at page 461 note 12, 72 S.Ct. at page ·438. Moreover, the Court noted that under certain circumstances the New York Order also requires cooperatives to be " 'determined by the Secretary to have sufficient plant capacity to receive all the milk of producers who are members and to be willing and able to receive milk from producers not members.' Id., at § 927.9(f) (3)." Ibid. The Court stated that presumably the omission of such provisions from the Boston Order was deliberate, and added, "In fact, the Secretary admits that many of the cooperatives in the Boston area were unwilling or unable to perform services such as those required by the New York Order." Ibid. The requirements mentioned by the Court are essentially retained and even made more specific by the 1953 amendments to the Order. With reference to maintaining facilities for the disposal of surplus milk, a cooperative in order to qualify for the relevant payment must operate marketing facilities, or have within its membership federated cooperatives operating marketing facilities, "at which is received at least 25 per centum, by weight, of the milk marketed by all the members of the cooperative or by all the members of the federated coop-

eratives." 7 C.F.R. § 927.76(e) (Supp. 1955). The Secretary found that the cooperatives which maintain standby facilities to allow producers to dispose of surplus milk refused by proprietary handlers do so at a greater financial burden than proprietary handlers who operate similar plants. He also found that such financial burden is a major handicap to some cooperatives, and that the nature of this marketwide service warrants payment to the cooperatives. With regard to the requirements imposed upon cooperatives to dispose of milk in such a way that all producers will benefit, the 1953 amendments made no material change. The Order now provides that a cooperative shall be disqualified if it "has failed, promptly after demand by the market administrator, to arrange for the utilization of milk under its control so as to yield the highest available net return to all producers without displacing an equivalent quantity of other producer milk in the preferred classification * * *." 7 C.F.R. §§ 927.76(g) (1) (i), 927.76 (g) (1) (iii) (Supp.1955). The Secretary found that the cooperatives perform a marketwide service in acting so as to assure the most desirable class utilization of milk, and the statements made by the Supreme Court in the Stark case indicate it would concur in that view. Confronted with these findings of the Secretary and the words of the Supreme Court regarding services performed by cooperatives under the New York Order in helping to solve the problems of surplus milk disposal and proper channeling of milk in the market, it is our view that the Stark decision is not hostile to the conclusion we reach and that, indeed, the opinion in some respects supports it.

The stay is vacated and in other respects the judgment is affirmed.

PRETTYMAN, Circuit Judge (dissenting).

I am unable to distinguish Brannan v. Stark as my brethren do. Despite what they point out, it seems to me clear that the Supreme Court held the same condi-

tions present in our case, or certainly very similar conditions, not to justify deductions for payments to the cooperatives. I do not overlook the contrast noted by the Court between the New York and the Boston orders, but that notation seems to me not to affect the gist of the Court's opinion. Were it not for my inability to distinguish that case, I would agree entirely with the excellent analysis and disposition of the problem which appear in the present opinion of this court.