**VAUGHN–GRIFFIN PACKING COMPANY, Plaintiff,**

v.

**Orville FREEMAN, Secretary of Agriculture of the United States of America, Defendant.**

**Civ. No. 68–78–ORL.**

United States District Court
M. D. Florida,
Orlando Division.
Sept. 20, 1968

Charles E. Davis, of Fishback, Davis, Dominick, Troutman & Salfi, Orlando, Fla., for plaintiff.

Edward F. Boardman, U. S. Atty., Tampa, Fla., for defendant.

## OPINION

GEORGE C. YOUNG, District Judge.

This case concerns and vitally affects the federal controls of marketing of fresh Florida grapefruit grown in what is termed (and hereinafter explained) as the Interior District of Florida. A brief history of those controls and the background of this case is necessary for the disposition of the issues before this Court.

After due notice a hearing was held on June 28, 1965 in the auditorium of the Florida Citrus Mutual Building at Lakeland, Florida, before Agricultural Department Hearing Examiner, G. Osmond Hyde, on a proposed Marketing Agreement and Order regulating, pursuant to 7 U.S.C. §§ 601–624, the handling of grapefruit to be grown in the Interior District of Florida. Thereafter, in the October 22, 1965 Federal Register, Volume 30, No. 205, there appeared a notice of the recommended decision of the Hearing Examiner and of an opportunity to file written exceptions with respect to the proposed Marketing Agreement and Order. No exceptions were filed and the November 13, 1965 Federal Register, Volume 30, No. 220, carried the decision and referendum Order with respect to the proposed Marketing Agreement and Order No. 913. The December 9, 1965 Federal Register, Volume 30, No. 237, carried Order No. 913 in full and final form.

The purpose of the Marketing Order is to permit the Secretary of Agriculture of the United States (hereinafter "Secretary") to limit the volume of fresh grapefruit shipped from the Interior District during a particular week. According to those proponents of the measure who testified at the initial hearing, such volume control would prevent glutting of the fresh grapefruit market in the north and thereby causing a plummetting of prices. A further consequence of such glutting would be that because the fresh grapefruit market could not absorb all of the fresh fruit available an additional load would be placed on the processing market (single strength canned juice and frozen concentrate) which would, in turn, cause a drop in the price paid by processors. The Order provided that for the first season of control (1965–66) there could only be an aggregate of six controlled weeks, that during the second season (1966–67) there could only be an aggregate of eight controlled weeks, and that in subsequent seasons there could only be an aggregate of ten weeks of control during any one season. The weeks of control could but did not have to be, consecutive.

Order 913 (hereinafter "Order") applies only to grapefruit grown in the "Interior District" of Florida which includes all of the area of Florida south of the Suwannee River less the easternmost counties of the state comprising what is known as the Indian River District (which latter area is under a separate,

earlier promulgated Marketing Order). The Interior District therefore runs from Columbia County in the north to Collier, Monroe and Dade Counties in the south.

The Order established an Interior Grapefruit Marketing Committee whose members and alternates are provided by the Order to be the same persons who are members and alternates of the Growers Administrative Committee and Shippers Adversary Committee selected under Order 905 (regulating grades and sizes of Florida fruit) whose residence and principal place of business are in the Interior District.

Upon a recommendation of 75 percent of the Committee for regulation of volume of fresh fruit for any week, the Secretary may limit the quantity of grapefruit which may be handled during a specified week. Each person who desires to handle grapefruit is required to secure from the Secretary each season a prorate base and thereafter during any weeks in that season in which volume control is put into effect a handler is given an allotment based upon such prorate base. The allotment of a handler of the total quantity allowed to be shipped in a controlled week is that portion of the total which is equal, in terms of percent, to the percentage that such handler's prorate base is of the aggregate of the prorate bases of all the handlers.

A handler is defined as a person who handles grapefruit in fresh form or keeps grapefruit to be so handled by selling or transporting grapefruit in the current of commerce between the Interior District and any point outside thereof.

Vaughn-Griffin Packing Company (hereinafter "Vaughn-Griffin") did not contest the promulgation of the Order at the initial hearing or during any of the steps leading to its final adoption. But in January 1967 Vaughn-Griffin filed its petition with the Secretary pursuant to 7 U.S.C. § 608c(15) (A) alleging the Order was not in accordance with the law and praying for its revocation or modification.

Thereafter the petition tread its lengthy way along the statutory administrative route. An evidentiary hearing was held in April 1967 before a Department of Agriculture Hearing Examiner; briefs were filed; in October 1967 the Examiner's Recommended Decision was issued adverse to petitioner who filed exceptions; oral arguments were had before the Department's Judicial Officer in Washington, D. C. in December 1967—on January 29, 1968 came the decision of the Judicial Officer adverse to petitioner with an Order denying and dismissing the petition. Pursuant to the provisions of 608c(15) (B) Vaughn-Griffin filed the Bill of Equity in this case on February 15, 1968 in the Ocala Division of the Middle District of Florida. The filing was timely and this Court has jurisdiction (Vaughn-Griffin has its principal place of business in Lake County, Florida, one of the counties in the Ocala Division, and, by stipulation of counsel, this case was transferred to the Orlando Division). Each party seeks a summary judgment in its favor and oral arguments were heard September 3, 1968.

In addition to the arguments and briefs directed to the opposing motions for summary judgment, this case has required—and received—this Court's review and consideration of the voluminous record of transcripts, exhibits, pleadings and briefs from the proceedings before the Secretary. The plaintiff does not challenge here the constitutionality of the Agricultural Marketing Act nor does it—or could it—seek a trial de novo before this Court. Section 608c(15) (B) provides judicial review may be had by an aggrieved handler in any U. S. District Court in which such handler is an inhabitant or has his principal place of business, that the jurisdiction of such Court is to review in equity the Secretary's ruling with such review limited to a determination of whether the Secretary's ruling is in accordance with the law.

Of significance in this case is the fact that Vaughn-Griffin is not only a handler of fresh grapefruit but is also a grower of most of the fruit it handles.

■ The record of Vaughn-Griffin's petition before the Secretary discloses a general dissatisfaction by Vaughn-Griffin witnesses with the compulsory marketing procedure. But neither the need nor the desirability of the Order may be litigated here. The sole yardstick of judicial review is: Was the Secretary's ruling denying and dismissing Vaughn-Griffin's petition in accordance with the law? Disregarding any issues of need or desirability, then, the basic remaining issues may, by a process of distillation of the pleadings, briefs and arguments, be categorized as follows:

I. That there were not sufficient signed Marketing Agreements as required by the Act.

II. That under the authority of the Order the Secretary has controlled the volume of fresh fruit shipments for various weeks prior to January of a season although the Order and the evidence in support of it contemplated only controls during a season in the weeks following January 1 of each year.

III. That the method prescribed by the Order for the issuance of a prorate base to a new handler is not in accord with the law and is discriminatory as to old handlers.

IV. That the initial base period for the determination of prorate bases for old handlers is not representative as required by the Act.

V. That the method prescribed by the Order for the issuance of a prorate base to an old handler is not equitable as required by the Act.

VI. That the procedure for the selection of Committee members results in a control of the determination of volume shipments by large handlers to the detriment of small handlers.

Each of these issues will be considered and discussed separately.

## I.

The threshold question, of course, is whether a sufficient number of Marketing Agreements had been reached by the Secretary with handlers to permit the Order to become effective pursuant to 7 U.S.C. § 608c(8). That section requires that no Order issued under the Marketing Act shall become effective until the handlers "of not less than 50 per centum of the volume of the commodity or product thereof covered by such order which is produced or marketed within the production or marketing area defined in such order have signed a marketing agreement, entered into pursuant to section 608b of this title, which regulates the handling of such commodity or product in the same manner as such order * * *." Plaintiff contends that this requirement was not met.

■ In the 1964–65 season there were produced in the Interior District of Florida some 23,300,000 boxes of grapefruit of which approximately 8,311,000 boxes were shipped in fresh form. Signed Marketing Agreements were obtained from handlers of 5,527,116 boxes of Interior District grapefruit shipped in fresh form during the 1964–65 season. If the Act requires a Marketing Agreement with the handlers of not less than 50 percent of *all* grapefruit grown in the Interior District, then the requirements of the Act have not been met; on the other hand, if the Act contemplated Marketing Agreements with only the handlers of not less than 50 percent of the fruit shipped in fresh form, then the requirements of the Act have been met as to this issue. It is the conclusion of this Court that the commodity or product covered by the Order is grapefruit shipped in fresh form, and that, therefore, the 50 percent requirement applied only to the volume of fruit shipped in fresh form. So it was not necessary for the Secretary to secure Marketing Agree-

ments from the handlers of 50 percent of all grapefruit and he did get a sufficient number to comply with the requirement of the statute.

## II.

The plaintiff's next point of attack concerns the controls which have been placed in effect and which, unless held illegal, will possibly be effected again for weeks during a shipping season prior to January 1. The plaintiff is correct that the evidence adduced at the hearing commencing on June 28, 1965 concerned a need for volume control only during the period following January 1st of each season. For example, Robert W. Rutledge, Executive Vice President of Florida Citrus Mutual, testified (page 20, June 28, 1965 transcript):

> "Early in the season our state maturity laws effectively limit shipments and generally the demand for fresh grapefruit is good during the months of November and December, however, the months of January, February and March are usually heavy shipping months and there are weeks when fruit prices are unnecessarily depressed because of unusually, or most of the time, unnecessary, heavy shipments. It is during these three months and possibly during early April that we believe such a limited program of volume control of interior fresh grapefruit shipments would be most effective. It is true that during these critical months just a few too many cars of fresh grapefruit shipped in any one week can and usually does seriously threaten and endanger the market."

Plaintiff contends that the notice in the Federal Register of the proposed Marketing Order included by reference all of the evidence at the Lakeland hearing and that neither the evidence nor the contents of the proposed Order gave any indication of an intention to permit the Order to include within the scope of controls weeks prior to January 1. While, as noted above, the evidence was directed toward the need for controls in the weeks of January, February, and March and possibly during April of a season, nevertheless there was no evidence nor is there any provision in the Order or proposed Order indicating that the controls could not be imposed during a week prior to January 1. The evidence favorable to the proposed Order supported the idea of a control where necessary to prevent catastrophic overshipments but the fact that subsequent circumstances might—as they apparently have—establish a need for controls prior to January 1 was not precluded by the Order. This attack of the plaintiff is actually not directed against the Order itself but against the actions of the Secretary pursuant to the Order, but this Court finds and holds that the Order and the notices given in connection with it do not preclude the imposition of controls for weeks prior to January 1 during a season. Neither the plaintiff nor any one else was deprived of due notice in this respect.

## III.

Plaintiff next contends that new handlers are given preferential treatment in the manner in which they are given prorata bases and that such procedure as set forth in the Marketing Order is not in accordance with the law and is discriminatory as to old handlers. 7 U.S.C. § 608c sets forth certain terms and conditions which shall be included in the Marketing Order and on the issues covered thereby. Section 608c(6) provides that no other terms or conditions except those set forth in the statute shall be included in the Order. Section 608c(6) (C) is the subsection pertinent to this issue; it requires that the Marketing Order shall provide for:

> "(C) Allotting, or providing methods for allotting, the amount of any such commodity or product, * * * which each handler may market in or transport to any or all markets in the current of interstate or foreign commerce * * * under a uniform rule based upon the amounts which each such handler has available for current

shipment, or upon the amount shipped by each such handler in such prior period as the Secretary determines to be representative, or both, to the end that the total quantity of such commodity or product * * * to be marketed in or transported to any or all markets in the current of interstate or foreign commerce * * * during any specified period or periods shall be equitably apportioned among all of the handlers thereof."

■ It is readily apparent from the above quoted language from the statute that the Order may provide for an allotment based on the amounts which each handler has available *or* upon past shipments *or* both and upon no other criteria. Section 913.43(e) of the Order provides the method for fixing "new handler" prorate bases:

"Any applicant for a prorate base who has made no shipments of grapefruit in the season immediately preceding the season for which prorate bases are being established, and who controls grapefruit and owns or has contracted for the use of a packing house or facility to pack such grapefruit, shall be considered a new handler. The committee shall compute a prorate base for such applicant based upon his prior shipments of grapefruit, if any, grapefruit under his control, and *any other factors* which, in the judgment of the committee are relevant and proper to be used in arriving at an equitable prorate base for such handler. For the next succeeding fiscal period, the prorate base for such handler shall be the quantity of grapefruit shipped by him during the preceding marketing season, and for the second succeeding marketing season, his prorate base shall be the seasonal average quantity of grapefruit shipped by him during the two preceding marketing seasons." (Emphasis supplied.)

It is apparent that Section 913.43(e) of the Order exceeds the criteria authorized by 7 U.S.C. § 608c(6) (C) for establishing allotments. Government counsel cite only Grant v. Benson, 97 U.S.App.D.C. 191, 229 F.2d 765 (1955), cert. den. 350 U.S. 1015, 76 S.Ct. 658, 100 L.Ed. 875 (1956) as authority for the Secretary's action in this respect. But a reading of *Grant,* supra, fails to disclose support for such a position.

■ The provision in Section 913.43 (e) of the Order giving the committee authority to use *"any other factors"* is inconsistent with the terms and conditions specified in 7 U.S.C. § 608c(6) (C). The latter section requires the Order to contain a "uniform rule" for fixing allotments. Giving the committee the authority to use, at its unlimited discretion, *"any other factors"* for determining a new handler's prorate base is inconsistent with the statutory mandate, and therefore not within the ambit of 7 U.S.C. § 608c(7) (D).[1]

Such lack of uniformity has been shown by the practice under the Order. The evidence adduced before the Hearing Examiner on plaintiff's petition revealed the committee had no fixed rules for fixing prorate bases for new handlers. Mr. Frank Seymour, manager of the Interior Grapefruit Marketing Committee, testified, in part, as follows:

"Q All right. Now do you know what the formula is for determining the basis for a new handler?

A No, sir. I wish I knew a formula for determining the base of a new handler.

\* \* \* \* \* \*

Q Well, does anybody know how a new handler's basis is determined?

A Well, no two new handlers are alike. Therefore you could not give an answer to that question. There is no one way of doing it.

1. 7 U.S.C. § 608c(7) (D) provides for a Marketing Order to contain terms and conditions "incidental to, and not inconsistent with, the terms and conditions specified in subsections (5)–(7) of" Section 608c.

There is no formula. It's based on all the factors that are pertinent to that particular handler." * * * (Tr. 173–174)

As was said in Brannan v. Stark, 342 U.S. 451, 465, 72 S.Ct. 433, 440, 96 L.Ed. 497 (in reference to a milk-marketing order), "Without support in the words of the statute the challenged provisions must fall * * *."

■ In addition to claiming the method for issuance of a prorate base to a new handler is contrary to the statute, plaintiff contends it is discriminatory as to old handlers. Whereas a new handler gets a prorate base under the Order from grapefruit under his control, among other factors, the fixing of a prorate base for an old handler eliminates any consideration of the amount of fruit under the old handler's current control and rests entirely on the record of past shipments. Again from the record, Mr. Frank Seymour testified:

"Q So we have an inflexible rule for old handlers that isn't in any way related to their needs or the quantity of fruit they have got to meet, whereas with new handlers there is no determinable formula for computing their basis; is that right, sir?

A I would say that's right, yes sir." (Tr. 174)

Such difference in the treatment of handlers does not provide the "uniform rule" required by 7 U.S.C. § 608c(6) (C). Government counsel argues that since a new handler has no past history of shipments no rule requiring absolute uniformity could include consideration of past shipments so that such uniform rule would eliminate past history as a possible standard as contemplated by the statute. Without suggesting what course should be taken, the argument fails to consider the procedure adopted by the Secretary as set forth in Secretary of Agriculture v. Central Roig Refining Company, 338 U.S. 604, 70 S.Ct. 403, 94 L.Ed. 381 (1950) where past marketing and ability

to market were given equal weight as to all refiners.

■ Due process requires equal application of the law except where based upon reasonable classification. For the purpose of determining a current allotment there is no reasonable distinction between an old handler and a new handler which would justify issuing allotments upon two entirely different standards. In this case Vaughn-Griffin complains, without contradiction, that a new handler with less available fruit than Vaughn-Griffin was able to secure a larger prorate base because of the difference in standards used to determine such bases. Therefore, not only the provision allowing the committee to use "any other factors" must fall, but the entire Section 913.43(e) of the Order must fall as violative of due process.

## IV.

The plaintiff takes the position that the initial base period for the determination of prorate bases for old handlers was not representative as required by 7 U.S.C. § 608c(6) (C). This contention stems from plaintiff's claim that a severe freeze in December, 1962, more seriously affected Vaughn-Griffin groves than many other groves.

Section 913.43(d) of the Order provides the method for computing a prorate base for an old handler:

"(d) Each week during the marketing season when volume regulation is likely to be recommended, the committee shall compute a prorate base for each handler who has made application in accordance with the provisions of this section. Except as provided in paragraph (e) of this section, such prorate base for each handler shall, for the 1965–66 fiscal period, be the quantity of grapefruit shipped by him during the preceding marketing season; for the 1966–67 fiscal period, be the average during the two preceding marketing seasons; and for subsequent fiscal periods, be the seasonal average quantity of grapefruit shipped by him

during the three preceding marketing seasons."

Stanley Smith, an employee of the Growers Administrative Committee, testified at the promulgation hearing as to the meaning and purpose of the various sections of the then proposed Order. He explained the reason the bases in the first season of control were to be figured on just one prior season. He said (Tr. 140 of promulgation hearing):

"Usually a Marketing Order like this has a past performance basis extending over more than a period of one year, usually probably three years, and in the case we have now, the freeze in 1962, you go back three years and try to figure up bases and it is not quite fair.

We have got shippers in the northern end that have not quite recovered for the past three years. In other words, we thought that if you had a base of one year, as we have in here, and we limit that—the first year to six weeks and then the second year we have past performance bases based on two years, and we limit the regulations to eight weeks, and on the third season of operation you will have three years of past performance bases which would tend to smooth out any inequities or unfairness that might be in the bases and I believe that was the reason we came up with the six weeks and the eight weeks and the ten weeks. It goes along with the past performance of one year, two years or three years."

 The determination of the initial base period was delegated by Congress to the Secretary. Unless it can be said that his decision on this point was not one that a fair-minded tribunal with specialized knowledge could have reached, his judgment may not be displaced by judicial intervention. Secretary of Agriculture v. Central Roig Refining Company, supra.

 The evidence showed that the 1962 freeze was taken into consideration in fixing the first base period. The action of the Secretary in its selection is supported by the record; it was not arbitrary or unreasonable. The plaintiff has failed to carry this issue.

V.

The plaintiff also argues that the method prescribed by the Order for the issuance of a prorate base to an old handler is not equitable as required by 7 U.S.C. § 608c(6) (C). C. V. Griffin, President of plaintiff, testified (Tr. 193–221) that in the 1966–67 season he expected to have approximately 350,000 boxes of grapefruit; that the previous season (1965–66) he had about 200,000 boxes but because of freeze damage in January, 1966, he had to sell most of it to processors. He testified that because of the 1962 freeze he was prevented from obtaining a prorate base commensurate with the fruit ordinarily available to him and the normal capacity of his packing plant (35,000 to 40,000 boxes a week—60% grapefruit, 40% oranges).

The evidence adduced before the Hearing Examiner was virtually uncontradicted that the plaintiff (which had hilltop groves) suffered greater damage than some other growers (who had lower lying or farther south groves) during the 1962 freeze, which would, of course, result in a lesser initial prorate base since in the plaintiff's case it primarily ships only its own fruit. In the season used to compute the prorate base (1964–65) the plaintiff shipped 77,060 boxes of fresh grapefruit at a time when its production was still low because of the 1962 freeze damage, not only to the crop of that year but also to the trees. While Vaughn-Griffin might have increased its volume of shipments in the 1964–65 season by purchasing outside grapefruit and thereby have raised its base in the following initial marketing season, it had no way of knowing during the 1964–65 season that the Marketing Order would be promulgated in the fall of 1965.

Mr. Griffin testified that the big purchasers of fresh grapefruit tended to purchase solely from the few big handlers who had large allotments (approx-

imately 20,000 boxes a week) because the purchaser could be sure that such handlers could fill the orders, whereas in dealing with Vaughn-Griffin, even though it might have the capacity to fill a 20,000 box order in a week if it should develop that controls should be imposed for the week it would be limited to the allotment for that week (which ran just above 2,000 boxes a week in 1966 and just above 1,500 boxes a week in the 1966–67 season).

■ Inasmuch as controls are now limited to an aggregate of ten weeks and certain provisions are included in the Order for shipments above a handler's allotment (in excess of 500 boxes or 10 percent of the handler's allotment, whichever is greater, may be handled in one week by a handler above his allotment for that week, and one handler may borrow an allotment from another handler) it cannot be judicially held that the method used for determining an old handler's prorate base is inequitable. This holding does not exclude the possibility that additional weeks of control combined with the lack of any consideration of problems arising from the considerable weather variations in the large Interior District could result in the allocation of allotments being inequitable and, therefore, not in conformity with the law. But this Court in this case is confined to the facts as shown by the record here and the rulings herein may not, and are not intended, to go beyond them.

In January, 1966, the plaintiff was aware of the Marketing Order and procedure but let its fresh fruit shipments drop to 29,548 boxes in the 1965–66 season. Even though the plaintiff suffered freeze damage in January, 1966, it could have purchased fruit and thereby kept its base up.

Because of the lower shipments in the 1965–66 season, plaintiff's base dropped to 53,304 boxes for 1966–67, but in the latter season plaintiff shipped 118,386 boxes. That increase resulted in raising plaintiff's base to 74,998 boxes for the 1967–68 season which shows it is possible for a handler to increase its prorate base under the present Order.

If the method of fixing old handler allotments is considered in conjunction with the method for fixing new handler allotments, the entire procedure is inequitable. As previously determined under Issue numbered III above, the method for fixing new handler allotments is discriminatory as to old handlers. With no record of *any* past shipments new handlers are able to get bases which, of course, proportionally reduces an old handler's share of the total to be shipped in a controlled week. The record (Plaintiff's Exhibit 5 before the Hearing Examiner) showed that in some weeks some new handlers had allotments substantially in excess of those given Vaughn-Griffin: for example, on January 14, 1966, Bear Lake Fruit Co. had an allotment of 3,263 boxes when Vaughn-Griffin had an allotment of 2,599; during the week of January 30, 1967, Imperial Growers had an allotment of 3,200 boxes when Vaughn-Griffin had an allotment of 1,365 boxes; on February 6, 1967, Imperial Growers had an allotment of 2,813 boxes when Vaughn-Griffin had an allotment of 1,499 boxes; on February 13, 1967, Imperial Growers had an allotment of 2,972 boxes and West Fruit Co. had an allotment of 3,726 boxes when Vaughn-Griffin had an allotment of only 1,584 boxes; February 20, 1967, Imperial Growers had an allotment of 3,104 boxes when Vaughn-Griffin had an allotment of only 1,655 boxes. Bear Lake Fruit Co., Imperial Growers and West Fruit Co. were all new handlers.

But this Court has already held herein above that the provision of the Order providing the method for fixing new handler allotments is invalid. The removal of that impediment leaves the present method for fixing old handler allotments free from judicial assault.

## VI.

■ Lastly, the plaintiff contends that the procedure for the selection of Committee members results in a control

of the determination of the volume shipments by large handlers to the detriment of small handlers. While the procedure established could conceivably result in a set of facts as alleged by the plaintiff, the evidence fails to support the allegations.

## CONCLUSION

In the opinion of this Court only that part of plaintiff's petition seeking to declare invalid the portion of the Order providing for new handler allotments should have been granted by the Secretary and in all other respects the Secretary was correct in denying and dismissing Vaughn-Griffin's petition.

Even the limited reversal of the Secretary as herein decided, is taken only after the most careful consideration of the evidence and applicable law. As said, in reference to a milk marketing order, by Circuit Judge Leventhal in Blair v. Freeman, 125 U.S.App.D.C. 207, 370 F.2d 229 (1966):

"A court's deference to administrative expertise rises to zenith in connection with the intricate complex of regulation of milk marketing. Any court is chary lest its disarrangement of such a regulatory equilibrium reflect lack of judicial comprehension more than lack of executive authority. In this case, however, continued reflection and diligent study have strengthened rather than shaken our conclusion that the Secretary's order is an invalid departure from the statutory scheme established by Congress."

The holding here does not invalidate the entire Order or any portion thereof except the language of Section 913.43(e) in its entirety. The case will be remanded to the Secretary for consideration of an appropriate amendment to the Order providing for a method for fixing new handler allotments under a uniform rule to the end that the total quantity of grapefruit to be shipped in any controlled week shall be equitably apportioned among all—new and old—of the handlers thereof.

## JUDGMENT

In accordance with the Opinion filed in this case on September 20, 1968, it is,

Ordered and adjudged that the relief prayed for in the Bill in Equity filed by Vaughn-Griffin Packing Company on February 15, 1968, be and is hereby granted only to the extent that Section 913.43(e) of Rule 913 (7 C.F.R., Part 913) be and is hereby invalidated as to "new handlers" (that is, any handlers who have made no shipments of grapefruit in the season immediately preceding the season for which prorate bases are to be established) but not as to any handler who received a prorate base under such section prior to the date hereof. In all other respects the relief prayed for in the Bill of Equity be and is hereby denied; it is further,

Ordered and adjudged that this cause is remanded to Orville Freeman, Secretary of Argiculture, for appropriate action to amend Order 913 so as to provide a method for fixing new handler allotments under a uniform rule to the end that the total quantity of grapefruit to be shipped in any controlled week shall be equitably apportioned among all handlers.